## ALLEN ET AL. *v.* STATE BOARD OF ELECTIONS ET AL.

No. 3.   Argued October 15, 1968.—Decided March 3, 1969.*

*Together with No. 25, *Fairley et al.* v. *Patterson, Attorney General of Mississippi, et al.,* No. 26, *Bunton et al.* v. *Patterson, Attorney General of Mississippi, et al.,* and No. 36, *Whitley et al.* v. *Williams, Governor of Mississippi, et al.,* on appeal from the United States District Court for the Southern District of Mississippi, argued on October 16, 1968.

*Norman C. Amaker* argued the cause for appellants in No. 3. With him on the brief were *Jack Greenberg, James M. Nabrit III, Oliver W. Hill, S. W. Tucker, Henry L. Marsh III,* and *Anthony G. Amsterdam. Armand Derfner* and *Elliott C. Lichtman* argued the cause for appellants in Nos. 25, 26, and 36. *Lawrence*

*Aschenbrenner* was on the brief for appellants in Nos. 25 and 26. With *Mr. Derfner* on the brief for appellants in No. 36 were *Alvin J. Bronstein* and *Richard B. Sobol.*

*R. D. McIlwaine III,* First Assistant Attorney General of Virginia, argued the cause for appellees in No. 3. With him on the brief were *Robert Y. Button,* Attorney General, *William R. Blandford,* and *William C. Carter. William A. Allain* and *Will S. Wells,* Assistant Attorneys General of Mississippi, argued the cause for appellees in Nos. 25, 26, and 36. With *Mr. Allain* on the brief for appellees in No. 25 were *Joe T. Patterson,* Attorney General, and *Dudley W. Conner.* With *Mr. Wells* on the briefs for appellees in Nos. 26 and 36 was *Mr. Patterson.*

*Assistant Attorney General Pollak* argued the cause for the United States, as *amicus curiae,* urging reversal in Nos. 25, 26, and 36. With him on the brief were *Solicitor General Griswold, Louis F. Claiborne, Francis X. Beytagh, Jr.,* and *Nathan Lewin.*

MR. CHIEF JUSTICE WARREN delivered the opinion of the Court.

These four cases, three from Mississippi and one from Virginia, involve the application of the Voting Rights Act of 1965 [1] to state election laws and regulations. The Mississippi cases were consolidated on appeal and argued together in this Court. Because of the grounds on which we decide all four cases, the appeal in the Virginia case is also disposed of by this opinion. [2]

---

[1] 79 Stat. 437, 42 U. S. C. § 1973 *et seq.* (1964 ed., Supp. I).

[2] In all four cases a three-judge court was convened. Nos. 25, 26, and 36 are direct appeals from the United States District Court for the Southern District of Mississippi. No. 3 is a direct appeal from the United States District Court for the Eastern District of Virginia.

In *South Carolina* v. *Katzenbach,* 383 U. S. 301 (1966), we held the provisions of the Act involved in these cases to be constitutional. These cases merely require us to determine whether the various state enactments involved are subject to the requirements of the Act.

We gave detailed treatment to the history and purposes of the Voting Rights Act in *South Carolina* v. *Katzenbach, supra.* Briefly, the Act implemented Congress' firm intention to rid the country of racial discrimination in voting. It provided stringent new remedies against those practices which have most frequently denied citizens the right to vote on the basis of their race. Thus, in States covered by the Act,[3] literacy tests and similar voting qualifications were suspended for a period of five years from the last occurrence of substantial voting discrimination. However, Congress apparently feared that the mere suspension of existing tests would not completely solve the problem, given the history some States had of simply enacting new and slightly different requirements with the same discriminatory effect.[4] Not underestimating the ingenuity of those bent on preventing Negroes from voting, Congress therefore enacted § 5, the focal point of these cases.

Under § 5, if a State covered by the Act passes any "voting qualification or prerequisite to voting, or standard, practice, or procedure with respect to voting different from that in force or effect on November 1, 1964," no person can be deprived of his right to vote "for failure to comply with" the new enactment "unless and until" the State seeks and receives a declaratory judgment in the United States District Court for the District of

---

[3] Both States involved in these cases have been determined to be covered by the Act. 30 Fed. Reg. 9897 (August 6, 1965).

[4] See H. R. Rep. No. 439, 89th Cong., 1st Sess., 10–11; S. Rep. No. 162, pt. 3, 89th Cong., 1st Sess., 8, 12.

Columbia that the new enactment "does not have the purpose and will not have the effect of denying or abridging the right to vote on account of race or color." 79 Stat. 439, 42 U. S. C. § 1973c (1964 ed., Supp. I). See Appendix, *infra*.

However, § 5 does not necessitate that a covered State obtain a declaratory judgment action before it can enforce any change in its election laws. It provides that a State may enforce a new enactment if the State submits the new provision to the Attorney General of the United States and, within 60 days of the submission, the Attorney General does not formally object to the new statute or regulation. The Attorney General does not act as a court in approving or disapproving the state legislation. If the Attorney General objects to the new enactment, the State may still enforce the legislation upon securing a declaratory judgment in the District Court for the District of Columbia. Also, the State is not required to first submit the new enactment to the Attorney General as it may go directly to the District Court for the District of Columbia. The provision for submission to the Attorney General merely gives the covered State a rapid method of rendering a new state election law enforceable.[5] Once the State has successfully complied with the § 5 approval requirements, private parties may enjoin the enforcement of the new enactment only in traditional

---

[5] At the oral argument in the Mississippi cases, Assistant Attorney General Pollak stated that the Department of Justice had received 251 submissions from the States under § 5. He further stated that the Department withheld consent in only one case, and that was where the change was contrary to a prior court decision on the same issue. He said that in two other instances the State inadvertently incorporated by reference another section of state law that contained a prohibited test or device. Transcript of Argument 63.

suits attacking its constitutionality; there is no further remedy provided by § 5.

In these four cases, the States have passed new laws or issued new regulations. The central issue is whether these provisions fall within the prohibition of § 5 that prevents the enforcement of "any voting qualification or prerequisite to voting, or standard, practice, or procedure with respect to voting" unless the State first complies with one of the section's approval procedures.

No. 25, *Fairley* v. *Patterson,* involves a 1966 amendment to § 2870 of the Mississippi Code of 1942.[6] The amendment provides that the board of supervisors of each county may adopt an order providing that board members be elected at large by all qualified electors of the county. Prior to the 1966 amendment, all counties by law were divided into five districts; each district elected one member of the board of supervisors. After the amendment, Adams and Forrest Counties adopted the authorized orders, specifying that each candidate must run at large, but also requiring that each candidate be a resident of the county district he seeks to represent.

The appellants are qualified electors and potential candidates in the two counties. They sought a declaratory judgment in the United States District Court for the Southern District of Mississippi that the amendment to § 2870 was subject to the provisions of § 5 of the Act and hence could not be enforced until the State complied with the approval requirements of § 5.[7]

No. 26, *Bunton* v. *Patterson,* concerns a 1966 amendment to § 6271–08 of the Mississippi Code.[8] The amend-

---

[6] See Appendix, *infra.*

[7] In all three cases from Mississippi the original complaint contained other grounds for relief; however, before hearing in the District Court, the parties stipulated that the only issue for decision was whether § 5 applied.

[8] See Appendix, *infra.*

ment provides that in 11 specified counties, the county superintendent of education shall be appointed by the board of education. Before the enactment of this amendment, all these counties had the option of electing or appointing the superintendent. Appellants are qualified electors and potential candidates for the position of county superintendent of education in three of the counties covered by the 1966 amendment. They sought a declaratory judgment that the amendment was subject to § 5, and thus unenforceable unless the State complied with the § 5 approval requirements.

No. 36, *Whitley* v. *Williams,* involves a 1966 amendment to § 3260 of the Mississippi Code, which changed the requirements for independent candidates running in general elections.[9] The amendment makes four revisions: (1) it establishes a new rule that no person who has voted in a primary election may thereafter be placed on the ballot as an independent candidate in the general election; (2) the time for filing a petition as an independent candidate is changed to 60 days before the primary election from the previous 40 days before the general election; (3) the number of signatures of qualified electors needed for the independent qualifying petition is increased substantially; and (4) a new provision is added that each qualified elector who signs the independent qualifying petition must personally sign the petition and must include his polling precinct and county. Appellants are potential candidates whose nominating petitions for independent listing on the ballot were rejected for failure to comply with one or more of the amended provisions.[10]

---

[9] See Appendix, *infra.*

[10] The suit was first brought in 1966. Pending a decision on the merits, a three-judge District Court ordered appellants placed on the 1966 general election ballot. *Whitley* v. *Johnson,* 260 F. Supp. 630 (D. C. S. D. Miss. 1966). Later, other members of the class

In all three of these cases, the three-judge District Court ruled that the amendments to the Mississippi Code did not come within the purview of and are not covered by § 5, and dismissed the complaints.[11]  Appellants brought direct appeals to this Court.[12]  We consolidated the cases and postponed consideration of jurisdiction to a hearing on the merits.  392 U. S. 902 (1968).

No. 3, *Allen* v. *State Board of Elections,* concerns a bulletin issued by the Virginia Board of Elections to all election judges.  The bulletin was an attempt to modify the provisions of § 24–252 of the Code of Virginia of 1950 which provides, *inter alia,* that "any voter [may] place on the official ballot the name of any person *in his own handwriting* . . . ." [13]  The Virginia Code (§ 24–251) further provides that voters with a physical incapacity may be assisted in preparing their ballots.  For example, one who is blind may be aided in the preparation of his ballot by a person of his choice.  Those unable to mark their ballots due to any other physical disability may be assisted by one of the election judges.  However, no statutory provision is made for assistance to those who wish to write in a name, but who are unable to do so because of illiteracy.  When Virginia was brought under the coverage of the Voting Rights Act of 1965, Virginia election officials apparently thought that the provision in § 24–252, requiring a voter to cast a write-in vote in the voter's own handwriting, was incompatible with the provisions of § 4 (a) of the Act suspending the

---

which appellants represent were denied places on the ballot for the 1967 general election for failing to comply with the amendment's requirements.

[11] No. 25, 282 F. Supp. 164, 165 (D. C. S. D. Miss. 1967) ; No. 26, 281 F. Supp. 918 (D. C. S. D. Miss. 1967).

[12] Appellants assert that this Court has jurisdiction on direct appeal under 28 U. S. C. § 1253 and 42 U. S. C. § 1973c (1964 ed., Supp. I).

[13] Emphasis added.  See Appendix, *infra.*

enforcement of any test or device as a prerequisite to voting.[14] Therefore, the Board of Elections issued a bulletin to all election judges, instructing that the election judge could aid any qualified voter in the preparation of his ballot, if the voter so requests and if the voter is unable to mark his ballot due to illiteracy.[15]

Appellants are functionally illiterate registered voters from the Fourth Congressional District of Virginia. They brought a declaratory judgment action in the United States District Court for the Eastern District of Virginia, claiming that § 24–252 and the modifying bulletin violate the Equal Protection Clause of the Fourteenth Amendment and the Voting Rights Act of 1965. A three-judge court was convened and the complaint dismissed.[16] A direct appeal was brought to this Court and we postponed consideration of jurisdiction to a hearing on the merits. 392 U. S. 902 (1968).

In the 1966 elections, appellants attempted to vote for a write-in candidate by sticking labels, printed with the name of their candidate, on the ballot. The election officials refused to count appellants' ballots, claiming that the Virginia election law did not authorize marking ballots with labels. As the election outcome would not have been changed had the disputed ballots been counted, appellants sought only prospective relief. In the District Court, appellants did not assert that § 5 precluded en-

---

[14] 79 Stat. 438, 42 U. S. C. § 1973b (a) (1964 ed., Supp. I). The Act defines "test or device" as "any requirement that a person as a prerequisite for voting or registration for voting (1) demonstrate the ability to read, write, understand, or interpret any matter . . . ." 79 Stat. 438, 42 U. S. C. § 1973b (c) (1964 ed., Supp. I).

[15] See Appendix, *infra*.

[16] *Allen* v. *State Board of Elections*, 268 F. Supp. 218 (D. C. E. D. Va. 1967). The District Court ruled that the requirement that write-in votes be in the voter's own handwriting was not unconstitutional; the court further ruled that § 24–252 was not suspended by § 4 of the Voting Rights Act as it was not a "test or device" as defined by the Act.

forcement of the procedure prescribed by the bulletin. Rather, they argued § 4 suspended altogether the requirement of § 24–252 that the voter write the name of his choice in the voter's own handwriting. Appellants first raised the applicability of § 5 in their jurisdictional statement filed with this Court. We are not precluded from considering the applicability of § 5, however. The Virginia legislation was generally attacked on the ground that it was inconsistent with the Voting Rights Act. Where all the facts are undisputed, this Court may, in the interests of judicial economy, determine the applicability of the provisions of that Act, even though some specific sections were not argued below.[17]

We postponed consideration of our jurisdiction in these cases to a hearing on the merits. Therefore, before reaching the merits, we first determine whether these cases are properly before us on direct appeal from the district courts.

## I.

These suits were instituted by private citizens; an initial question is whether private litigants may invoke the jurisdiction of the district courts to obtain the relief requested in these suits. 28 U. S. C. § 1343 provides: "The district courts shall have original jurisdiction of any civil action authorized by law to be commenced by any person: . . . (4) To recover damages or to secure equitable or other relief under any Act of Congress providing for the protection of civil rights, including the right to vote." Clearly, if § 5 authorizes appellants to secure the relief sought, the district courts had jurisdiction over these suits.

The Voting Rights Act does not explicitly grant or deny private parties authorization to seek a declaratory judg-

---

[17] See *Boynton* v. *Virginia,* 364 U. S. 454, 457 (1960); cf. *Bell* v. *Maryland,* 378 U. S. 226, 237–242 (1964); *Silver* v. *United States,* 370 U. S. 717, 718 (1962).

ment that a State has failed to comply with the provisions of the Act.[18]  However, § 5 does provide that "no person shall be denied the right to vote for failure to comply with [a new state enactment covered by, but not approved under, § 5]." Analysis of this language in light of the major purpose of the Act indicates that appellants may seek a declaratory judgment that a new state enactment is governed by § 5.  Further, after proving that the State has failed to submit the covered enactment for § 5 approval, the private party has standing to obtain an injunction against further enforcement, pending the State's submission of the legislation pursuant to § 5.[19]

---

[18] Section 12 (f) of the Act, 79 Stat. 444, 42 U. S. C. § 1973j (f) (1964 ed., Supp. I), provides: "The district courts of the United States shall have jurisdiction of proceedings instituted pursuant to this section and shall exercise the same without regard to whether *a person* asserting rights under the provisions of this Act shall have exhausted any administrative or other remedies that may be provided by law." (Emphasis added.)

Appellants have argued this section necessarily implies that private parties may bring suit under the Act, relying on the language "a person."  While this argument has some force, the question is not free from doubt, since the specific references throughout the other subsections of § 12 are to the Attorney General. *E. g.,* §§ 12 (d) and 12 (e). However, we find merit in the argument that the specific references to the Attorney General were included to give the Attorney General power to bring suit to enforce what might otherwise be viewed as "private" rights. See *United States* v. *Raines,* 362 U. S. 17, 27 (1960).

In any event, there is certainly no specific exclusion of private actions.  Section 12 (f) is at least compatible with 28 U. S. C. § 1343 and might be viewed as authorizing private actions.

[19] It is important to distinguish the instant cases from those brought by a State seeking a declaratory judgment that its new voting laws do not have a discriminatory purpose or effect. Cf. *Apache County* v. *United States,* 256 F. Supp. 903 (D. C. D. C. 1966).  In the latter type of cases the substantive questions necessary for approval (*i. e.,* discriminatory purpose or effect) are liti-

The Act was drafted to make the guarantees of the Fifteenth Amendment finally a reality for all citizens. *South Carolina* v. *Katzenbach, supra,* at 308, 309. Congress realized that existing remedies were inadequate to accomplish this purpose and drafted an unusual, and in some aspects a severe, procedure for insuring that States would not discriminate on the basis of race in the enforcement of their voting laws.[20]

The achievement of the Act's laudable goal could be severely hampered, however, if each citizen were required to depend solely on litigation instituted at the discretion of the Attorney General.[21] For example, the provisions of the Act extend to States and the *subdivisions thereof.* The Attorney General has a limited staff and often might be unable to uncover quickly new regulations and enactments passed at the varying levels of state government.[22]

gated, while in the cases here decided the only question is whether the new legislation must be submitted for approval.

[20] Appellees argue that § 5 only conferred a new "remedy" on the Attorney General of the United States. They argue that it gave citizens no new "rights," rather it merely gave the Attorney General a more effective means of enforcing the guarantees of the Fifteenth Amendment. It is unnecessary to reach the question of whether the Act creates new "rights" or merely gives plaintiffs seeking to enforce existing rights new "remedies." However the Act is viewed, the inquiry remains whether the right or remedy has been conferred upon the private litigant.

[21] The enforcement provisions provide that the Attorney General *"may* institute . . . an action" or *"may* . . . file . . . an application for an order."  79 Stat. 443, 42 U. S. C. §§ 1973j (d), (e) (1964 ed., Supp. I) (emphasis added).

Of course the private litigant could always bring suit under the Fifteenth Amendment. But it was the inadequacy of just these suits for securing the right to vote that prompted Congress to pass the Voting Rights Act. *South Carolina* v. *Katzenbach, supra,* at 309.

[22] As of January 1968, the Attorney General had brought only one action to force a State to comply with § 5. United States Commission on Civil Rights, Political Participation 164–165 (1968).

It is consistent with the broad purpose of the Act to allow the individual citizen standing to insure that his city or county government complies with the § 5 approval requirements.

We have previously held that a federal statute passed to protect a class of citizens, although not specifically authorizing members of the protected class to institute suit, nevertheless implied a private right of action. In *J. I. Case Co.* v. *Borak,* 377 U. S. 426 (1964), we were called upon to consider § 14 (a) of the Securities Exchange Act of 1934. 48 Stat. 895, 15 U. S. C. § 78n (a). That section provides that it shall be "unlawful for any person . . . [to violate] such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors." We held that "[w]hile this language makes no specific reference to a private right of action, among its chief purposes is 'the protection of investors,' which certainly implies the availability of judicial relief where necessary to achieve that result." 377 U. S., at 432.

A similar analysis is applicable here. The guarantee of § 5 that no person shall be denied the right to vote for failure to comply with an unapproved new enactment subject to § 5, might well prove an empty promise unless the private citizen were allowed to seek judicial enforcement of the prohibition.[23]

## II.

Another question involving the jurisdiction of the district courts is presented by § 14 (b) of the Act. It provides that "[n]o court other than the District Court

---

[23] It is significant that the United States has urged that private litigants have standing to seek declaratory and injunctive relief in these suits. Memorandum of the United States as *Amicus Curiae* 8, n. 7.

for the District of Columbia . . . shall have jurisdiction to issue any declaratory judgment pursuant to [§ 5] or any restraining order or temporary or permanent injunction against the execution or enforcement of any provision of this Act . . . ." 79 Stat. 445, 42 U. S. C. § 1973*l* (b) (1964 ed., Supp. I). The appellants sought declaratory judgments that the state enactments were subject to § 5 of the Act; appellees thus argue that these actions could be initiated only in the District Court for the District of Columbia.

Section 14 (b) must be read with the Act's other enforcement provisions. Section 12 (f) provides that the district courts shall have jurisdiction over actions brought pursuant to § 12 (d) to enjoin a person from acting when "there are reasonable grounds to believe that [such person] is about to engage in any act or practice prohibited by [§ 5]." [24] These § 12 (f) injunctive actions are distinguishable from the actions mentioned in § 14 (b). The § 14 (b) injunctive action is one aimed at prohibiting enforcement of the provisions of the Voting Rights Act, and would involve an attack on the constitutionality of the Act itself. See *Katzenbach* v. *Morgan,* 384 U. S. 641 (1966). On the other hand, the § 12 (f) action is aimed at prohibiting the enforcement of a state enactment that is for some reason violative of the Act. Cf. *United States* v. *Ward,* 352 F. 2d 329 (C. A. 5th Cir. 1965); *Perez* v. *Rhiddlehoover,* 247 F. Supp. 65 (D. C. E. D. La. 1965).

A similar distinction is possible with respect to declaratory judgments. A declaratory judgment brought by the *State* pursuant to § 5 requires an adjudication that a new enactment does not have the purpose or effect of racial discrimination. However, a declaratory judgment action brought by a *private litigant* does not require the Court to reach this difficult substantive issue. The only

---

[24] 79 Stat. 444, 42 U. S. C. §§ 1973j (d), (f) (1964 ed., Supp. I).

issue is whether a particular state enactment is subject to the provisions of the Voting Rights Act, and therefore must be submitted for approval before enforcement. The difference in the magnitude of these two issues suggests that Congress did not intend that both can be decided only by the District of Columbia District Court. Indeed, the specific grant of jurisdiction to the district courts in § 12 (f) indicates Congress intended to treat "coverage" questions differently from "substantive discrimination" questions. See *Perez* v. *Rhiddlehoover, supra,* at 72.

Moreover, as we indicated in *South Carolina* v. *Katzenbach, supra,* the power of Congress to require suits to be brought only in the District of Columbia District Court is grounded in Congress' power, under Art. III, § 1, to "ordain and establish" inferior federal tribunals. We further noted Congress did not exceed constitutional bounds in imposing limitations on *"litigation against the Federal Government. . . ."* 383 U. S., at 332 (emphasis added). Of course, in declaratory judgment actions brought by private litigants, the United States will not be a party. This distinction further suggests interpreting § 14 (b) as applying only to declaratory judgment actions brought by the State.

There are strong reasons for adoption of this interpretation. Requiring that declaratory judgment actions be brought in the District of Columbia places a burden on the plaintiff. The enormity of the burden, of course, will vary with the size of the plaintiff's resources. Admittedly, it would be easier for States to bring § 5 actions in the district courts in their own States. However, the State has sufficient resources to prosecute the actions easily in the Nation's Capital; and, Congress has power to regulate which federal court shall hear suits against the Federal Government. On the other hand, the individual litigant will often not have sufficient resources

to maintain an action easily outside the district in which he resides, especially in cases where the individual litigant is attacking a local city or county regulation. Thus, for the individual litigant, the District of Columbia burden may be sufficient to preclude him from bringing suit.

We hold that the restriction of § 14 (b) does not apply to suits brought by private litigants seeking a declaratory judgment that a new state enactment is subject to the approval requirements of § 5, and that these actions may be brought in the local district court pursuant to 28 U. S. C. § 1343 (4).

### III.

A final jurisdictional question remains. These actions were all heard before three-judge district courts. We have jurisdiction over an appeal brought directly from the three-judge court only if the three-judge court was properly convened. *Pennsylvania Public Utility Comm'n v. Pennsylvania R. Co.,* 382 U. S. 281 (1965); *Zemel v. Rusk,* 381 U. S. 1, 5 (1965); see 28 U. S. C. § 1253. Appellants initially claimed that the statutes and regulations in question violated the Fifteenth Amendment. However, by stipulation these claims were removed from the cases prior to a hearing in the District Court and the cases were submitted solely on the question of the applicability of § 5.[25] We held in *Swift & Co. v. Wickham,* 382 U. S. 111, 127 (1965), that a three-judge court is not required under 28 U. S. C. § 2281 if the state statute is attacked on the grounds that it is in conflict with a federal statute and consequently violates the Supremacy Clause. These suits involve such an attack

---

[25] This jurisdictional question does not apply to No. 3, however. In No. 3, the three-judge court also considered and ruled on appellants' claims that the Virginia statute and regulations were in conflict with the Constitution. 268 F. Supp. 218, 220 (D. C. E. D. Va. 1967). Thus, No. 3 is properly before this Court on direct appeal. 28 U. S. C. § 1253.

and, in the absence of a statute authorizing a three-judge court, would not be proper before a district court of three judges.

Appellants maintain that § 5 authorizes a three-judge court in suits brought by private litigants to enforce the approval requirements of the section. The final sentence of § 5 provides that "[a]ny action *under this section* shall be heard and determined by a court of three judges . . . and any appeal shall lie to the Supreme Court." 42 U. S. C. § 1973c (1964 ed., Supp. I) (emphasis added). Appellees argue that this sentence refers only to the action specifically mentioned in the first sentence of § 5 (*i. e.,* declaratory judgment suits brought by the State) and does not apply to suits brought by the private litigant.

As we have interpreted § 5, suits involving the section may be brought in at least three ways. First, of course, the State may institute a declaratory judgment action. Second, an individual may bring a suit for declaratory judgment and injunctive relief, claiming that a state requirement is covered by § 5, but has not been subjected to the required federal scrutiny. Third, the Attorney General may bring an injunctive action to prohibit the enforcement of a new regulation because of the State's failure to obtain approval under § 5. All these suits may be viewed as being brought "under" § 5. The issue is whether the language "under this section" should be interpreted as authorizing a three-judge action in these suits.

We have long held that congressional enactments providing for the convening of three-judge courts must be strictly construed. *Phillips* v. *United States,* 312 U. S. 246 (1941). Convening a three-judge court places a burden on our federal court system, and may often result in a delay in a matter needing swift initial adjudication. See *Swift & Co.* v. *Wickham, supra,* at 128. Also, a

direct appeal may be taken from a three-judge court to this Court, thus depriving us of the wise and often crucial adjudications of the courts of appeals. Thus we have been reluctant to extend the range of cases necessitating the convening of three-judge courts. *Ibid.*

However, we have not been unaware of the legitimate reasons that prompted Congress to enact three-judge-court legislation. See *Swift & Co.* v. *Wickham, supra,* at 116–119. Notwithstanding the problems for judicial administration, Congress has determined that three-judge courts are desirable in a number of circumstances involving confrontations between state and federal power or in circumstances involving a potential for substantial interference with government administration.[26] The Voting Rights Act of 1965 is an example. Federal supervision over the enforcement of state legislation always poses difficult problems for our federal system. The problems are especially difficult when the enforcement of state enactments may be enjoined and state election procedures suspended because the State has failed to comply with a federal approval procedure.

In drafting § 5, Congress apparently concluded that if the governing authorities of a State differ with the Attorney General of the United States concerning the purpose or effect of a change in voting procedures, it is inappropriate to have that difference resolved by a single district judge. The clash between federal and state power and the potential disruption to state government are apparent. There is no less a clash and potential for disruption when the disagreement concerns whether a state enactment is subject to § 5. The result of both

___

[26] See, *e. g.*, 42 Stat. 168, 7 U. S. C. § 217 (suits to restrain enforcement of orders of the Secretary of Agriculture); 28 U. S. C. § 2282 (suits to enjoin enforcement of federal statute); 63 Stat. 479, 49 U. S. C. § 305 (g) (suits to review negative orders of the ICC).

suits can be an injunction prohibiting the State from enforcing its election laws. Although a suit brought by the individual citizen may not involve the same federal-state confrontation, the potential for disruption of state election procedures remains.

Other provisions of the Act indicate that Congress was well aware of the extraordinary effect the Act might have on federal-state relationships and the orderly operation of state government. For example, § 10, which prohibits the collection of poll taxes as a prerequisite to voting, contains a provision authorizing a three-judge court when the Attorney General brings an action "against the enforcement of any requirement of the payment of a poll tax as a precondition to voting . . . ." 79 Stat. 442, 42 U. S. C. §§ 1973h (a)–(c) (1964 ed., Supp. I). See also 42 U. S. C. § 1973b (a) (1964 ed., Supp. I).

We conclude that in light of the extraordinary nature of the Act in general, and the unique approval requirements of § 5, Congress intended that disputes involving the coverage of § 5 be determined by a district court of three judges.

## IV.

Finding that these cases are properly before us, we turn to a consideration of whether these state enactments are subject to the approval requirements of § 5. These requirements apply to "any voting qualification or prerequisite to voting, or standard, practice, or procedure with respect to voting . . . ." 42 U. S. C. § 1973c (1964 ed., Supp. I). The Act further provides that the term "voting" "shall include all action necessary to make a vote effective in any primary, special, or general election, including, but not limited to, registration, listing . . . or other action required by law prerequisite to voting, casting a ballot, and having such ballot counted properly and included in the appropriate totals of votes cast with respect to candidates for public

or party office and propositions for which votes are received in an election." § 14 (c)(1), 79 Stat. 445, 42 U. S. C. § 1973*l* (c)(1) (1964 ed., Supp. I). See Appendix, *infra*. Appellees in the Mississippi cases maintain that § 5 covers only those state enactments which prescribe who may register to vote. While accepting that the Act is broad enough to insure that the votes of all citizens should be cast, appellees urge that § 5 does not cover state rules relating to the qualification of candidates or to state decisions as to which offices shall be elective.

Appellees rely on the legislative history of the Act to support their view, citing the testimony of former Assistant Attorney General Burke Marshall before a subcommittee of the House Committee on the Judiciary:

> "Mr. Corman. We have not talked at all about whether we have to be concerned with not only who can vote, but who can run for public office and that has been an issue in some areas in the South in 1964. Have you given any consideration to whether or not this bill ought to address itself to the qualifications for running for public office as well as the problem of registration?
>
> "Mr. Marshall. The problem that the bill was aimed at was the problem of registration, Congressman. If there is a problem of another sort, I would like to see it corrected, but that is not what we were trying to deal with in the bill." [27]

Appellees in No. 25 also argue that § 5 was not intended to apply to a change from district to at-large voting, because application of § 5 would cause a conflict in the administration of reapportionment legislation.

---

[27] Hearings on H. R. 6400 before Subcommittee No. 5 of the House Committee on the Judiciary, 89th Cong., 1st Sess., ser. 2, p. 74 (hereinafter House Hearings).

They contend that under such a broad reading of § 5, enforcement of a reapportionment plan could be enjoined for failure to meet the § 5 approval requirements, even though the plan had been approved by a federal court.[28] Appellees urge that Congress could not have intended to force the States to submit a reapportionment plan to two different courts.[29]

We must reject a narrow construction that appellees would give to § 5. The Voting Rights Act was aimed at the subtle, as well as the obvious, state regulations which have the effect of denying citizens their right to vote because of their race.[30] Moreover, compatible with the decisions of this Court, the Act gives a broad inter-

[28] For example, appellees argue that even though a redistricting plan had been approved by a federal district court, under a broad interpretation of § 5, the Attorney General might bring suit under § 12 (d) (79 Stat. 444, 42 U. S. C. § 1973j (d) (1964 ed., Supp. I)) seeking an injunction because the State had failed to comply with the approval requirements of § 5.

[29] Appellees in No. 3 also argue that § 5 does not apply to the regulation in their case, because that regulation was issued in an attempt to comply with the provisions of the Voting Rights Act. They argue that if § 5 applies to the Virginia regulation, covered States would be prohibited from quickly complying with the Act. We cannot accept this argument, however. A State is not exempted from the coverage of § 5 merely because its legislation is passed in an attempt to comply with the provisions of the Act. To hold otherwise would mean that legislation, allegedly passed to meet the requirements of the Act, would be exempted from § 5 coverage— even though it would have the effect of racial discrimination. It is precisely this situation Congress sought to avoid in passing § 5.

[30] "Congress knew that some of the States covered by § 4 (b) of the Act had resorted to the extraordinary stratagem of contriving new rules of various kinds for the sole purpose of perpetuating voting discrimination in the face of adverse federal court decrees. Congress had reason to suppose that these States might try similar maneuvers in the future in order to evade the remedies for voting discrimination contained in the Act itself." *South Carolina* v. *Katzenbach,* 383 U. S. 301, 335 (1966).

pretation to the right to vote, recognizing that voting includes "all action necessary to make a vote effective." 79 Stat. 445, 42 U. S. C. § 1973*l*(c)(1) (1964 ed., Supp. I). See *Reynolds* v. *Sims,* 377 U. S. 533, 555 (1964). We are convinced that in passing the Voting Rights Act, Congress intended that state enactments such as those involved in the instant cases be subject to the § 5 approval requirements.

The legislative history on the whole supports the view that Congress intended to reach any state enactment which altered the election law of a covered State in even a minor way. For example, § 2 of the Act, as originally drafted, included a prohibition against any "qualification or procedure." During the Senate hearings on the bill, Senator Fong expressed concern that the word "procedure" was not broad enough to cover various practices that might effectively be employed to deny citizens their right to vote. In response, the Attorney General said he had no objection to expanding the language of the section, as the word "procedure" "was intended to be all-inclusive of any kind of practice." [31] Indicative of an intention

---

[31] Hearings on S. 1564 before the Senate Committee on the Judiciary, 89th Cong., 1st Sess., pt. 1, pp. 191–192 (hereinafter Senate Hearings):

"Senator FONG. . . . Mr. Attorney General, turning to section 2 of the bill, which reads as follows:

" 'No voting qualification or procedure shall be imposed or applied to deny or abridge the right to vote on account of race or color—' there is no definition of the word 'procedure' here. I am a little afraid that there may be certain practices that you may not be able to include in the word 'procedure.'

"For example, if there should be a certain statute in a State that says the registration office shall be open only 1 day in 3, or that the hours will be so restricted, I do not think you can bring such a statute under the word 'procedure.' Could you?

"Attorney General KATZENBACH. I would suppose that you could if it had that purpose. I had thought of the word 'procedure' as

to give the Act the broadest possible scope, Congress expanded the language in the final version of § 2 to include any "voting qualifications or prerequisite to voting, or standard, practice, or procedure." 42 U. S. C. § 1973 (1964 ed., Supp. I).

Similarly, in the House hearings, it was emphasized that § 5 was to have a broad scope:

> "Mr. KATZENBACH. The justification for [the approval requirements] is simply this: Our experience in the areas that would be covered by this bill has been such as to indicate frequently on the part of State legislatures a desire in a sense to outguess the courts of the United States or even to outguess the Congress of the United States. . . . [A]s the Chairman may recall . . . at the time of the initial school desegregation, . . . the legislature passed I

including any kind of practice of that kind if its purpose or effect was to deny or abridge the right to vote on account of race or color.

"Senator FONG. The way it is now written, do you think there may be a possibility that the Court would hassle over the word 'procedure'? Or would, probably, it allow short registration days or restricted hours to escape this provision of the statute?

"Attorney General KATZENBACH. I do not believe so, Senator, although the committee might consider that. The language was used in the 1964 act on a similar matter, did use the terms 'standards, practices, or procedures.' Perhaps that would be broader than simply the word 'procedure' and perhaps the committee might consider making that point clear.

"Senator FONG. You would have no objection to expanding the word 'procedure'?

"Attorney General KATZENBACH. No; it was intended to be all-inclusive of any kind of practice.

"Senator FONG. I know that in section 3 (a) you have very much in detail spelled out the words 'test or device.'

"Attorney General KATZENBACH. Yes.

"Senator FONG. But you have not spelled out the word 'procedure.' I think that the word 'procedure' should be spelled out a little more.

"Attorney General KATZENBACH. I think that is a good suggestion, Senator."

don't know how many laws in the shortest period of time. Every time the judge issued a decree, the legislature . . . passed a law to frustrate that decree.

"If I recollect correctly, the school board was ordered to do something and the legislature immediately took away all authority of the school boards. They withdrew all funds from them to accomplish the purposes of the act." House Hearings 60.

Also, the remarks of both opponents and proponents during the debate over passage of the Act demonstrate that Congress was well aware of another admonition of the Attorney General.[32] He had stated in the House hearings that two or three types of changes in state election law (such as changing from paper ballots to voting machines) could be specifically excluded from § 5 without undermining the purpose of the section. He emphasized, however, that there were "precious few" changes that could be excluded "because there are an awful lot of things that could be started for purposes of evading the 15th amendment if there is the desire to do so." House Hearings 95. It is significant that Congress chose not to include even these minor exceptions in § 5, thus indicating an intention that all changes, no matter how small, be subjected to § 5 scrutiny.

In light of the mass of legislative history to the contrary, especially the Attorney General's clear indication that the section was to have a broad scope and Congress' refusal to engraft even minor exceptions, the single remark of Assistant Attorney General Burke Marshall cannot be given determinative weight. Indeed, in any case where the legislative hearings and debate are so voluminous, no single statement or excerpt of testimony can

[32] *E. g.*, 111 Cong. Rec. 10727 (remarks of Senator Tydings); 111 Cong. Rec. 10725 (remarks of Senator Talmadge); 111 Cong. Rec. 8303 (remarks of Senator Hart).

be conclusive.[33]   Also, the question of whether § 5 might cause problems in the implementation of reapportionment legislation is not properly before us at this time. There is no direct conflict between our interpretation of this statute and the principles involved in the reapportionment cases.   The argument that some administrative problem might arise in the future does not establish that Congress intended that § 5 have a narrow scope; we leave to another case a consideration of any possible conflict.

The weight of the legislative history and an analysis of the basic purposes of the Act indicate that the enactment in each of these cases constitutes a "voting qualification or prerequisite to voting, or standard, practice, or procedure with respect to voting" within the meaning of § 5.

No. 25 involves a change from district to at-large voting for county supervisors.   The right to vote can be affected by a dilution of voting power as well as by an absolute prohibition on casting a ballot.   See *Reynolds* v. *Sims,* 377 U. S. 533, 555 (1964).   Voters who are members of a racial minority might well be in the majority in one district, but in a decided minority in the county as a whole.   This type of change could therefore nullify their ability to elect the candidate of their choice just as would prohibiting some of them from voting.

In No. 26 an important county officer in certain counties was made appointive instead of elective.   The power of a citizen's vote is affected by this amendment; after

---

[33] "The House and Senate Committees on the Judiciary each held hearings for nine days and received testimony from a total of 67 witnesses.  More than three full days were consumed discussing the bill on the floor of the House, while the debate in the Senate covered 26 days in all." *South Carolina* v. *Katzenbach,* 383 U. S. 301, 308–309 (1966).

the change, he is prohibited from electing an officer formerly subject to the approval of the voters. Such a change could be made either with or without a discriminatory purpose or effect; however, the purpose of § 5 was to submit such changes to scrutiny.

The changes in No. 36 appear aimed at increasing the difficulty for an independent candidate to gain a position on the general election ballot. These changes might also undermine the effectiveness of voters who wish to elect independent candidates. One change involved in No. 36 deserves special note. The amendment provides that no person who has voted in a primary election may thereafter be placed on the ballot as an independent candidate in the general election. This is a "procedure with respect to voting" with substantial impact. One must forgo his right to vote in his party primary if he thinks he might later wish to become an independent candidate.

The bulletin in No. 3 outlines new procedures for casting write-in votes. As in all these cases, we do not consider whether this change has a discriminatory purpose or effect. It is clear, however, that the new procedure with respect to voting is different from the procedure in effect when the State became subject to the Act; therefore, the enactment must meet the approval requirements of § 5 in order to be enforceable.

In these cases, as in so many others that come before us, we are called upon to determine the applicability of a statute where the language of the statute does not make crystal clear its intended scope. In all such cases we are compelled to resort to the legislative history to determine whether, in light of the articulated purposes of the legislation, Congress intended that the statute apply to the particular cases in question. We are of the opinion that, with the exception of the statement of Assistant Attorney General Burke Marshall, the balance of legislative history (including the statements of the Attorney General and congressional action expanding the

language) indicates that § 5 applies to these cases. In saying this, we of course express no view on the merit of these enactments; we also emphasize that our decision indicates no opinion concerning their constitutionality.

## V.

Appellees in the Mississippi cases argue that even if these state enactments are covered by § 5, they may now be enforced, since the State submitted them to the Attorney General and he has failed to object. While appellees admit that they have made no "formal" submission to the Attorney General, they argue that no formality is required. They say that once the Attorney General has become aware of the state enactment, the enactment has been "submitted" for purposes of § 5. Appellees contend that the Attorney General became aware of the enactments when served with a copy of appellees' briefs in these cases.

We reject this argument. While the Attorney General has not required any formal procedure, we do not think the Act contemplates that a "submission" occurs when the Attorney General merely becomes aware of the legislation, no matter in what manner. Nor do we think the service of the briefs on the Attorney General constituted a "submission." A fair interpretation of the Act requires that the State in some unambiguous and recordable manner submit any legislation or regulation in question directly to the Attorney General with a request for his consideration pursuant to the Act.

## VI.

Appellants in the Mississippi cases have asked this Court to set aside the elections conducted pursuant to these enactments and order that new elections be held under the pre-amendment laws. The Solicitor General has also urged us to order new elections if the State does not promptly institute § 5 approval proceedings. We de-

cline to take corrective action of such consequence, however. These § 5 coverage questions involve complex issues of first impression—issues subject to rational disagreement. The state enactments were not so clearly subject to § 5 that the appellees' failure to submit them for approval constituted deliberate defiance of the Act. Moreover, the discriminatory purpose or effect of these statutes, if any, has not been determined by any court. We give only prospective effect to our decision, bearing in mind that our judgment today does not end the matter so far as these States are concerned. They remain subject to the continuing strictures of § 5 until they obtain from the United States District Court for the District of Columbia a declaratory judgment that for at least five years they have not used the "tests or devices" prohibited by § 4. 42 U. S. C. § 1973b (a) (1964 ed., Supp. I).

In No. 3 the judgment of the District Court is vacated; in Nos. 25, 26, and 36 the judgments of the District Court are reversed. All four cases are remanded to the District Courts with instructions to issue injunctions restraining the further enforcement of the enactments until such time as the States adequately demonstrate compliance with § 5.

*It is so ordered.*

## APPENDIX TO OPINION OF THE COURT.

Changes in the Mississippi statutes are indicated as follows: material added by amendment is italicized and material deleted by amendment is underscored. Portions of the statutes unchanged by amendment are printed in plain roman.

Section 5 of the Voting Rights Act of 1965:

"Whenever a State or political subdivision with respect to which the prohibitions set forth in section 4 (a) [42 U. S. C. § 1973b (a)] are in effect shall enact or seek

to administer any voting qualification or prerequisite to voting, or standard, practice, or procedure with respect to voting different from that in force or effect on November 1, 1964, such State or subdivision may institute an action in the United States District Court for the District of Columbia for a declaratory judgment that such qualification, prerequisite, standard, practice, or procedure does not have the purpose and will not have the effect of denying or abridging the right to vote on account of race or color, and unless and until the court enters such judgment no person shall be denied the right to vote for failure to comply with such qualification, prerequisite, standard, practice, or procedure: *Provided,* That such qualification, prerequisite, standard, practice, or procedure may be enforced without such proceeding if the qualification, prerequisite, standard, practice, or procedure has been submitted by the chief legal officer or other appropriate official of such State or subdivision to the Attorney General and the Attorney General has not interposed an objection within sixty days after such submission, except that neither the Attorney General's failure to object nor a declaratory judgment entered under this section shall bar a subsequent action to enjoin enforcement of such qualification, prerequisite, standard, practice, or procedure. Any action under this section shall be heard and determined by a court of three judges in accordance with the provisions of section 2284 of title 28 of the United States Code and any appeal shall lie to the Supreme Court." 79 Stat. 439, 42 U. S. C. § 1973c (1964 ed., Supp. I).

The Act further provides:

"The terms 'vote' or 'voting' shall include all action necessary to make a vote effective in any primary, special, or general election, including, but not limited to, registration, listing pursuant to this Act, or other action required by law prerequisite to voting, casting a ballot,

and having such ballot counted properly and included in the appropriate totals of votes cast with respect to candidates for public or party office and propositions for which votes are received in an election." 79 Stat. 445, 42 U. S. C. § 1973*l* (c)(1) (1964 ed., Supp. I).

Section 2870 of the Mississippi Code:

"Each county shall be divided into five (5) districts, with due regard to equality of population and convenience of situation for the election of members of the boards of supervisors, but the districts as now existing shall continue until changed. The qualified electors of each district shall elect, at the next general election, and every four (4) years thereafter, in their district, one (1) member of the board of supervisors; and the board, by unanimous vote of all members elected or when so ordered by a vote of the majority of the qualified electors of the districts affected voting in an election as hereinafter provided, may at any time, except as hereinafter provided, change or alter the district, the boundaries to be entered at large in the minutes of the proceedings of the board.

"The board, upon the petition of twenty-five per cent (25%) of the qualified electors of the county, asking that the districts of the county be changed, or altered, and setting out in such petition the changes, or alterations desired, shall call a special election for a date which shall be not less than thirty (30), nor more than sixty (60) days from the date of the presentation of the petition to the assembled board. A majority of the qualified electors of the county shall determine the issue of such election.

"Provided, however, that in any county in the state having a supervisors district containing more than fifty per cent (50%) of the population of the county according to the last federal census and/or more than fifty per

cent (50%) of the assessed valuation of the county, the issue of the election heretofore provided for shall be determined by a majority of those participating in said election.

"Provided further, however, that in any county in the state bordering on the Gulf of Mexico or Mississippi Sound and having a population in excess of eighty thousand (80,000) according to the last federal census, the issue of the election heretofore provided for shall be determined by a majority of the qualified electors of the county, and if such majority fail to vote affirmatively, no new petition shall be considered for four (4) years. Each such election shall be based upon a petition of twenty-five per cent (25%) of the qualified electors of the county, and to which petition shall be attached a map or plat defining the boundaries of each beat as proposed by said map or plat, and the election thereon shall be on such proposal.

"And the board, whenever a majority of the qualified electors of the county shall have voted to change or alter the existing districts to those set forth and described in the petition, shall at its first meeting thereafter establish said proposed districts by order on its minutes, to be effective on the first day of January following; and in default thereof, may be commanded to do so by writ of mandamus.

"When the districts are changed, by the qualified electors in an election as aforesaid, the board, of its own motion, shall not change or alter said districts within four (4) years thereafter.

"*The board of supervisors of any county may adopt an order providing that all the qualified electors of the county shall be eligible to vote for each member of the board of supervisors but each candidate shall be a resi-*

*dent of the district which he proposes to represent; said order to be adopted and published in a newspaper having general circulation in the county at least twelve (12) months prior to the next general election wherein said supervisors are elected.*

*"If twenty per cent (20%) of the qualified electors of the county shall present the board of supervisors with a petition objecting to such alternate method within sixty (60) days after the adoption and final publication of any such alternative method, then the board of supervisors shall call an election after publishing notice thereof in a newspaper published in the county once a week for at least three (3) weeks prior to such election and the question on the ballot shall be whether the entire electorate of the county shall be required to vote for the members of the board of supervisors at large, or whether the qualified electors in the said districts shall vote for the candidate in that district. If the majority of those voting vote that all the qualified electors shall be eligible to vote for candidates in each district, then thereafter all elections for members of boards of supervisors shall so be held. If not, members of the boards of supervisors shall continue to be elected by the electorate of their respective districts and the board of supervisors shall not be permitted to adopt this alternative method of electing members of boards of supervisors again until two (2) years have transpired.*

"This act shall not be construed to affect any supervisor now holding office until the expiration and end of his present term of office."

Section 6271–08 of the Mississippi Code:

. . . . .

"(b) Notwithstanding the provisions of subsection (a) hereof, the office of county superintendent of education may be made appointive in any county in the manner herein provided. Upon the filing of a petition signed

by not less than twenty per cent (20%) of the qualified electors of such county, it shall be the duty of the board of supervisors of such county, within sixty (60) days after the filing of such petition, to call a special election at which there shall be submitted to the qualified electors of such county the question of whether the office of county superintendent of education of said county shall continue to be elective or shall be filled by appointment by the county board of education of said county. Provided, however, that where a Class Three county having an area in excess of eight hundred twenty-five (825) square miles has a county unit school system comprising less than an entire county, the petition shall only be signed by electors residing within the county unit school district and only electors of said district shall vote on the proposition of appointing the county superintendent of education. The order calling such special election shall designate the date upon which same shall be held and a notice of such election, signed by the clerk of the board of supervisors, shall be published once a week for at least three (3) consecutive weeks in at least one (1) newspaper published in such county. The first publication of such notice shall be made not less than twenty-one (21) days prior to the date fixed for such election and the last publication shall be made not more than seven (7) days prior to such date. If no newspaper is published in such county then such notice shall be given by publication of same for the required time in some newspaper having a general circulation in such county and, in addition, by posting a copy of such notice for at least twenty-one (21) days next preceding such election at three (3) public places in such county, one (1) of which shall be at the door of the county courthouse in each judicial district. Said election shall be held, as far as is practicable, in the same manner as other elections are held in such county and all qualified electors

578

of the county may vote therein. If a majority of such qualified electors who vote in such election shall vote in favor of the appointment of the county superintendent of education by the county board of education then, at the expiration of the term of the county superintendent of education then in office, the county superintendent of education of said county shall not be elected but shall thereafter be appointed by the county board of education for a term of not more than four (4) years; otherwise, said office shall remain elective. No special election shall be held in any county under the provisions of this subsection more often than once in every four (4) years, and no change from the elective to the appointive method of the selection of the county superintendent of education shall become effective except at the expiration of the term of the county superintendent of education in office at the time such election is held.

"In any county of the first class lying wholly within a levee district and within which there is situated a city of more than forty thousand (40,000) population according to the last decennial federal census the county superintendent of education shall hereafter be appointed by the county board of education as above provided.

*"In any county of the second class wherein Interstate Highway 55 and State Highway 22 intersect and which is also traversed in whole or in part by U. S. Highways 49 and 51, and State Highways 16, 17 and 43 and the Natchez Trace; in any Class Four county having a population in excess of twenty-five thousand (25,000) according to the 1960 Federal census, traversed by U. S. Interstate Highway 55 and wherein Mississippi Highways 12 and 17 intersect; in any county created after 1916 through which the Yazoo River flows; in any Class Four county having a land area of six hundred ninety-five (695) square miles, bordering on the State of Alabama, wherein the Treaty of Dancing Rabbit was signed and*

*wherein U. S. Highway 45 and Mississippi Highway 14 intersect; in any county bordering on the Mississippi River wherein lies the campus of a land-grant institution or lands contiguous thereto owned by the institution; in any county lying within the Yazoo-Mississippi Delta Levee District, bordering upon the Mississippi River, and having a county seat with a population in excess of twenty-one thousand (21,000) according to the Federal census of 1960; in any county having a population of twenty-six thousand seven hundred fifty-nine (26,759) according to the 1960 Federal census, and wherein U. S. Highway 51 and U. S. Highway 84 and the Illinois Central Railroad and the Mississippi Central Railroad intersect; in any Class Three county wherein is partially located a national forest and wherein U. S. Highway 51 and Mississippi Highway 28 intersect, with a 1960 Federal census of twenty-seven thousand fifty-one (27,051) and a 1963 assessed valuation of $16,692,304.00; the county superintendent of education hereafter shall be appointed by the county board of education.*

*"In any county bordering on the Gulf of Mexico or Mississippi Sound, having therein a test facility operated by the National Aeronautics and Space Administration, the county superintendent of education shall be appointed by the county board of education beginning January 1, 1972."*

Section 3260 of the Mississippi Code:

"The ballot shall contain the names of all candidates who have been put in nomination, not less than forty (40) days previous to the day of the election, by the primary election of any political party. There shall be printed on the ballots the names of all persons so nominated, whether the nomination be otherwise known or not, upon the written request of one or more of the candidates so nominated, or of any qualified elector who

will make oath that he was a participant in the primary election, and that the person whose name is presented by him was nominated by such primary election. *No person who has voted in a primary election shall thereafter have his name placed upon the ballot as an independent candidate for any office to be determined by the general election; any independent candidate must qualify on or before the time established by statute for qualification of candidates seeking nominations in primary elections.* The commissioner shall also have printed on the ballot in any general or special election the name of any candidate who, not having been nominated by a political party, shall have been requested to be a candidate for any office *as an independent candidate* by a petition filed *on or before the statutory time* with said commissioner not less than forty (40) days prior to the election, and signed by not less than the following number of qualified electors:

"(a) For an office elected by the state at large, not less than one thousand (1,000) *ten thousand (10,000)* qualified electors.

"(b) For an office elected by the qualified electors of a supreme court district, not less than three hundred (300) *three thousand five hundred (3,500)* qualified electors.

"(c) For an office elected by the qualified electors of a congressional district, not less than two hundred (200) *two thousand (2,000)* qualified electors.

"(d) For an office elected by the qualified electors of a circuit or chancery court district, not less than one hundred (100) *one thousand (1,000)* qualified electors.

"(e) For an office elected by the qualified electors of a county, a senatorial *district,* or floatorial [*sic*] district, *a supervisors district,* or a municipality having a population of one thousand (1,000) or more, not less than *ten per cent (10%) of the qualified electors of said county, senatorial district, supervisors district, or municipality,*

*or not less than five hundred (500),* fifty (50) qualified electors, *whichever is the lesser.*

"(f) For an office elected by the qualified electors of a supervisors district or a municipality having a population of less than one thousand (1,000), not less than fifteen (15) *ten per cent (10%) of the* qualified electors *of said supervisors district or municipality.*

"*Each elector shall personally sign said petition which signature shall not be counted unless same includes his polling precinct and county.*

"*There shall be attached to each petition above provided for upon the time of filing with said commission, a certificate from the appropriate registrar or registrars showing the number of qualified electors appearing upon each such petition which the registrar shall furnish to the petitioner upon request.*

"Unless the petition required above shall be filed not less than forty (40) days prior to the election, *Unless the petition required above shall be filed not later than the time required for primary elections,* the name of the person requested to be a candidate, unless nominated by a political party, shall not be placed upon the ballot. The ballot shall contain the names of each candidate for each office, and such names shall be listed under the name of the political party such candidate represents."

Section 24–252 of the Code of Virginia of 1950:

"*Insertion of names on ballots.*—At all elections except primary elections it shall be lawful for any voter to place on the official ballot the name of any person in his own handwriting thereon [*sic*] and to vote for such other person for any office for which he may desire to vote and mark the same by a check (√) or cross (× or +) mark or a line (—) immediately preceding the name inserted. Provided, however, that nothing contained in this section shall affect the operation of § 24–251 of the Code of Virginia. No ballot, with a name or names placed

thereon in violation of this section, shall be counted for such person."

The Bulletin issued by the State Board of Elections:

"On August 6, 1965, the 'Voting Rights Act of 1965' enacted by the Congress of the United States became effective and is now in force in Virginia. Under the provisions of this Act, any person qualified to vote in the General Election to be held November 2, 1965, who is unable to mark or cast his ballot, in whole or in part, because of a lack of literacy (in addition to any of the reasons set forth in Section 24–251 of the Virginia Code) shall, if he so requests, be aided in the preparation of his ballot by one of the judges of election selected by the voter. The judge of election shall assist the voter, upon his request, in the preparation of his ballot in accordance with the voter's instructions, and shall not in any manner divulge or indicate, by signs or otherwise, the name or names of the person or persons for whom any voter shall vote.

"These instructions also apply to precincts in which voting machines are used."

MR. JUSTICE HARLAN, concurring in part and dissenting in part.

The Court's opinion seeks to do justice by granting each side half of what it requests. The majority first grants appellants all they could hope for, by adopting an overly broad construction of § 5 of the Voting Rights Act. As if to compensate for its generosity, the Court then denies some of the same appellants the relief that they deserve. Section 5 is thereby reduced to a dead letter in a very substantial number of situations in which it was intended to have its full effect.[1]

---

[1] I concur in the Court's disposition of the complex jurisdictional issues these cases present. While I consider the question whether § 5 authorizes a three-judge court a close one, it is clear to me

## I.

I shall first consider the Court's extremely broad construction of § 5. It is best to begin by delineating the precise area of difference between the position the majority adopts and the one which I consider represents the better view of the statute. We are in agreement that in requiring federal review of changes in any "standard, practice, or procedure with respect to voting," Congress intended to include all state laws that changed the process by which voters were registered and had their ballots counted. The Court, however, goes further to hold that a State covered by the Act must submit for federal approval all those laws that could arguably have an impact on Negro voting power, even though the manner in which the election is conducted remains unchanged. I believe that this reading of the statute should be rejected on several grounds. It ignores the place of § 5 in the larger structure of the Act; it is untrue to the statute's language; and it is unsupported by the legislative history.

## A.

First, and most important, the Court's construction ignores the structure of the complex regulatory scheme

that we would not avoid very many three-judge courts whatever we decide. I would suspect that generally a plaintiff attacking a state statute because it has not been federally approved under § 5 could also make at least a substantial constitutional claim that the state statute is discriminatory in its purpose or effect. Consequently, in the usual case a three-judge court would always be convened under 28 U. S. C. § 2281. Once convened, the Court would, of course, first consider the plaintiff's § 5 argument in the name of avoiding a constitutional question. Therefore, it appears to me that there is no good reason to invoke the normal rule that three-judge court statutes should be construed as narrowly as possible. As the Court suggests, the more natural reading of the statute confers jurisdiction on three-judge courts even in an action brought by private parties.

created by the Voting Rights Act. The Court's opinion assumes that § 5 may be considered apart from the rest of the Act. In fact, however, the provision is clearly designed to march in lock-step with § 4—the two sections cannot be understood apart from one another. Section 4 is one of the Act's central provisions, suspending the operation of all literacy tests and similar "devices" [2] for at least five years in States whose low voter turnout indicated that these "tests" and "devices" had been used to exclude Negroes from the suffrage in the past. Section 5, moreover, reveals that it was not designed to implement new substantive policies but that it was structured to assure the effectiveness of the dramatic step that Congress had taken in § 4. The federal approval procedure found in § 5 only applies to those States whose literacy tests or similar "devices" have been suspended by § 4. As soon as a State regains the right to apply a literacy test or similar "device" under § 4, it also escapes the commands of § 5.

The statutory scheme contains even more striking characteristics which indicate that § 5's federal review procedure is ancillary to § 4's substantive commands. A State may escape § 5, *even though it has consistently violated this provision,* so long as it has complied with § 4, and has suspended the operation of literacy tests and other "devices" for five years. On the other hand, no matter how faithfully a State complies with § 5, it

---

[2] Section 4 (c) reads:

"The phrase 'test or device' shall mean any requirement that a person as a prerequisite for voting or registration for voting (1) demonstrate the ability to read, write, understand, or interpret any matter, (2) demonstrate any educational achievement or his knowledge of any particular subject, (3) possess good moral character, or (4) prove his qualifications by the voucher of registered voters or members of any other class."

remains subject to its commands so long as it has not consistently obeyed § 4.[3]

As soon as it is recognized that § 5 was designed solely to implement the policies of § 4, it becomes apparent that the Court's decision today permits the tail to wag the dog. For the Court has now construed § 5 to require a revolutionary innovation in American government that goes far beyond that which was accomplished by § 4. The fourth section of the Act had the profoundly important purpose of permitting the Negro people to gain access to the voting booths of the South once and for all. But the action taken by Congress in § 4 proceeded on the premise that once Negroes had gained free access to the ballot box, state governments would then be suitably responsive to their voice, and federal intervention would not be justified. In moving against "tests and devices" in § 4, Congress moved only against those techniques that prevented Negroes from voting at all. Congress did not attempt to restructure state governments. The Court now reads § 5, however, as vastly increasing the sphere of federal intervention beyond that contemplated by § 4, despite the fact that the two pro-

---

[3] The Solicitor General expressly adopts this construction of the statute in his supplemental *amicus* brief. In any event, the Act is clear: § 4 (a) permits a State to free itself from § 4 by proving to a District Court in the District of Columbia that no *"test or device* has been used during the five years preceding the filing of the action for the purpose or with the effect of denying or abridging the right to vote on account of race or color." (Emphasis supplied.) As already noted, see n. 2, *supra*, the phrase "test or device" is a term of art including a class of statutes much narrower than those included under § 5. However, since § 5 applies by its own terms only to "a State or political subdivision with respect to which the prohibitions set forth in section 4 (a) are in effect," a State that escapes from § 4, escapes from § 5 as well, even though it has not complied with that section.

visions were designed simply to interlock. The District Court for the District of Columbia is no longer limited to examining any new state statute that may tend to deny Negroes their right to vote, as the "tests and devices" suspended by § 4 had done. The decision today also requires the special District Court to determine whether various systems of representation favor or disfavor the Negro voter—an area well beyond the scope of § 4. Section 4, for example, does not apply to States and localities which have in the past permitted Negroes to vote freely, but which arguably have limited minority voting power by adopting a system in which various legislative bodies are elected on an at-large basis. And yet, in *Fairley* v. *Patterson,* No. 25, the Court holds that a statute permitting the at-large election of county boards of supervisors must be reviewed by federal authorities under § 5. Moreover, it is not clear to me how a court would go about deciding whether an at-large system is to be preferred over a district system. Under one system, Negroes have *some* influence in the election of *all* officers; under the other, minority groups have *more* influence in the selection of *fewer* officers. If courts cannot intelligently compare such alternatives, it should not be readily inferred that Congress has required them to undertake the task.

The Court's construction of § 5 is even more surprising in light of the Act's regional application. For the statute, as the Court now construes it, deals with a problem that is national in scope. I find it especially difficult to believe that Congress would single out a handful of States as requiring stricter federal supervision concerning their treatment of a problem that may well be just as serious in parts of the North as it is in the South.[4]

---

[4] Indeed, I would have very substantial constitutional difficulties with the statute if I were to accept such a construction.

The difficulties with the Court's construction increase even further when the language of the statute is considered closely. When standing alone, the statutory formula requiring federal approval for changes in any "standard, practice, or procedure with respect to voting" can be read to support either the broad construction adopted by the majority or the one which I have advanced. But the critical formula does not stand alone. Immediately following the statute's description of the federal approval procedure, § 5 proceeds to describe the type of relief an aggrieved voter may obtain if a State enforces a new statute without obtaining the consent of the appropriate federal authorities: "no person shall be denied the right to vote *for failure to comply* with such qualification, prerequisite, standard, practice, or procedure." (Emphasis supplied.) This remedy serves to delimit the meaning of the formula in question. Congress was clearly concerned with changes in procedure with which voters could *comply*. But a law, like that in *Fairley* v. *Patterson,* No. 25, which permits all members of the County Board of Supervisors to run in the entire county and not in smaller districts, does not require a voter *to comply* with anything at all, and so does not come within the scope of the language used by Congress. While the Court's opinion entirely ignores the obvious implications of this portion of the statute, the Solicitor General's *amicus* brief candidly admits that this provision is flatly inconsistent with the broad reading the Government has advanced and this Court has adopted. The Government's brief simply suggests that Congress' choice of the verb "comply" was merely the result of an oversight. I cannot accept such a suggestion, however, when Congress' choice of language seems to me to be consistent with the general statutory framework as I understand it.

### B.

While the Court's opinion does not confront the factors I have just canvassed, it does attempt to justify its holding on the basis of its understanding "of the legislative history and an analysis of the basic purposes of the Act." *Ante*, at 569. Turning first to consider the Act's basic purposes, the Court suggests that Congress intended to adopt the concept of voting articulated in *Reynolds* v. *Sims*, 377 U. S. 533 (1964), and protect Negroes against a dilution of their voting power. See *ante*, at 565–566, 569. It is clear, of course, that the Court's reapportionment decisions do not apply of their own force to the problem before us. This is a statute we are interpreting, not a broad constitutional provision whose contours must be defined by this Court. The States are required to submit certain kinds of legislation for federal approval only if Congress, acting within its powers, so provided. And the fact is that Congress consciously *refused* to base § 5 of the Voting Rights Act on its powers under the Fourteenth Amendment, upon which the reapportionment cases are grounded. The Act's preamble states that it is intended "[t]o enforce the fifteenth amendment to the Constitution of the United States, and for other purposes." When Senator Fong of Hawaii suggested that the preamble include a citation to the Fourteenth Amendment as well, the Attorney General explained that he "would have quite a strong preference not to," because "I believe that S. 1564 as drafted can be squarely based on the 15th amendment." Hearings on S. 1564 before the Senate Committee on the Judiciary, 89th Cong., 1st Sess., pt. 1, p. 193. Attorney General Katzenbach's position was restated repeatedly,[5] and any men-

---

[5] See, *e. g.*, Senate Hearings, *supra*, at 35, 141; Hearings on H. R. 6400 before Subcommittee No. 5 of the House Committee on the Judiciary, 89th Cong., 1st Sess., ser. 2, p. 102.

tion of the Fourteenth Amendment is absent from this portion of the statute.[6]

As the reapportionment cases rest upon the Equal Protection Clause, they cannot be cited to support the claim that Congress, in passing this Act, intended to proceed against state statutes regulating the nature of the constituencies legislators could properly represent. If Congress intended, as it clearly did, to ground § 5 on the Fifteenth Amendment, the leading voting case is not *Reynolds* v. *Sims,* but *Gomillion* v. *Lightfoot,* 364 U. S. 339 (1960). While that case establishes the proposition that redistricting done with the purpose of excluding Negroes from a municipality violates the Fifteenth Amendment, it also maintains the distinction between an attempt to exclude Negroes totally from the relevant constituency, and a statute that permits Negroes to vote but which uses the gerrymander to contain the impact of Negro suffrage.

It is unnecessary, of course, to decide whether *Gomillion* v. *Lightfoot* marks the limit of the Fifteenth Amendment. It is enough to recognize that Congress did not in any way adopt the reapportionment cases' expansive concept of voting when it enacted the Voting Rights Act of 1965. Once it is determined that *Reynolds* v. *Sims* holds no magic key to the "basic purposes" of this statute, one is obliged to determine the Act's purposes in more traditional ways. And it is here where the Court's opinion fails to convince. As I have already suggested, the Act's structure assigns to § 5 a role that is a good deal more modest than the one which the majority gives it.[7]

---

[6] When, in § 10 of the Act, Congress moved against the imposition of poll taxes, it expressly invoked the Fourteenth Amendment as providing an additional basis for its action in this specific area. See § 10 (b).

[7] The Court seeks to strengthen its case by looking to the language of one of the definitional sections of the Act. *Ante,* at 565–566. Section 14 (c) (1) defines the term "vote" or "voting" to "include

The majority is left, then, relying on its understanding of the legislative history. With all deference, I find that the history the Court has garnered undermines its case, insofar as it is entitled to any weight at all. I refer not only to the unequivocal statement of Assistant Attorney General Burke Marshall, *ante*, at 564, which the Court concedes to be diametrically opposed to the construction it adopts. For the lengthy testimony of Attorney General Katzenbach, upon which the Court seems to rely, actually provides little more support for its position. Mr. Katzenbach, unlike his principal assistant, was never directly confronted with the question raised here, and we are left to guess as to his views. If guesses are to be made, however, surely it is important to note that though the Attorney General used many examples to illustrate the operation of § 5, each of them concerned statutes that had an immediate impact on voter qualifications or which altered the manner in which the election was conducted.[8] One would imagine that if the

---

all action necessary to make a vote *effective* in any primary, special, or general election, *including, but not limited to,* registration, listing pursuant to this Act, or other action required by law prerequisite to voting, casting a ballot, and having such ballot counted properly and included in the appropriate totals of votes cast with respect to candidates for public or party office and propositions for which votes are received in an election." (Emphasis supplied.) All of the aspects of voting that are enumerated in this definition concern the procedures by which voters are processed. When the statute cautions that its enumeration of stages in the election process is not exclusive, it merely indicates that the change of any other procedure that prevents the voter from having his ballot finally counted is also included within the range of the Act's concern. Surely the Court is entirely ignoring the textual context when it seeks to read the italicized phrases as embracing all electoral laws that affect the amount of political power Negroes will derive from the exercise of the franchise, even when the way in which voters are processed remains unchanged.

[8] The examples given by the Attorney General concerned changes in a State's voting age, residence, or property requirements; changes

Attorney General believed that § 5 had the remarkable sweep the majority has now given it, one of his hypotheticals would have betrayed that fact.[9]

## C.

Section 5, then, should properly be read to require federal approval only of those state laws that change either voter qualifications or the manner in which elections are conducted. This does not mean, however, that

in the frequency that registrars' offices are open; and changes from paper ballots to machines or vice versa. See House Hearings, *supra*, n. 5, at 60–62, 95; Senate Hearings, *supra*, at 191–192, 237.

[9] The Court emphasizes three specific colloquies in which Mr. Katzenbach participated to support its understanding of the legislative history. In the most important one, see *ante*, at 566–567, n. 31, Senator Fong expressed concern that § 5, which at that time merely required federal review of changes in state "procedures," would not encompass a state regulation which would radically limit the hours during which new voters could register. The Attorney General agreed that the statute should be elaborated to more clearly include such a change. Since such a law alters the manner in which voters are processed, I fail to see how this colloquy undermines my construction of the section—which clearly requires federal review in cases of the sort Mr. Katzenbach and Senator Fong were discussing. Similarly, a second extract highlighted by the Court, *ante*, at 567–568, is one in which the Attorney General emphasizes that § 5 is intended to prevent the States from evading the requirements of § 4—a point I believe to count strongly in favor of the interpretation I deem the correct one. Finally, it is quite true that the Attorney General opposed carving out exceptions from § 5 that would permit the State to switch from paper ballots to voting machines without federal approval. See *ante*, at 568. But this fact hardly indicates that he or anyone else was of the opinion that the section required review of statutes that did not concern themselves with voting procedures. In fact, on the one occasion that Mr. Katzenbach discussed the reapportionment cases in connection with § 5, he indicated no awareness whatever that § 5 could be construed to apply to cases involving laws that change the voting power of various groups. See House Hearings, *supra*, at 93–94.

the District Courts in the four cases before us were right in unanimously concluding that the Voting Rights Act did not apply. Rather, it seems to me that only the judgment in *Fairley* v. *Patterson,* No. 25, should be affirmed, as that case involves a state statute which simply gives each county the right to elect its Board of Supervisors on an at-large basis.

In *Whitley* v. *Williams,* No. 36, however, Mississippi's new statute both imposes new qualifications on independent voters who wish to nominate a candidate by petition and alters the manner in which such nominations are made.[10]   Since the Voting Rights Act explicitly covers "primary" elections, see § 14 (c)(1), the only significant question presented is whether a petitioning procedure should be considered a "primary" within the meaning of the Act.   As the nominating petition is the functional equivalent of the political primary, I can perceive no good reason why it should not be included within the ambit of the Act.

The statute involved in *Bunton* v. *Patterson,* No. 26, raises a somewhat more difficult problem of statutory interpretation.   If one looks to its impact on the voters, the State's law making the office of school superintendent appointive enacts a "voting qualification" of the most drastic kind.   While under the old regime all registered voters could cast a ballot, now none are qualified.   On the other hand, one can argue that the concept of a "voting qualification" presupposes that there will be a vote.   On balance, I would hold that the statute comes

_____

[10] The statute requires supporters of a candidate to write their own names on the nominating petition, together with their polling district.   Moreover, petitions must be filed by an earlier date and must contain many more signatures.   The Act also imposes a "voting qualification" on those who wish to vote in a party primary, by providing that they may not subsequently compete with the primary victor by running as an independent candidate.

within § 5. Cf. *Gomillion* v. *Lightfoot, supra.* Such a holding would not, of course, disable the State from adopting an appointive system after the force of § 5 has spent itself.

Finally, Virginia has quite obviously altered the manner in which an election is conducted when for the first time it has been obliged to issue regulations concerning the way in which illiterate voters shall be processed at the polls. Consequently, I would reverse the lower court's decision in the *Allen* case, No. 3.

## II.

After straining to expand the scope of § 5 beyond its proper limits, the majority surprisingly refuses to grant appellants in the Mississippi cases [11] the only relief that will effectively implement the Act's purposes. As the Court recognizes, *ante,* at 572, the Voting Rights Act only applies to the States for a limited period of time— Mississippi may free itself from § 5's requirements in 1970.[12] And yet the Court affords appellants in the Mississippi cases only declaratory relief, permitting state

[11] In the *Allen* case, coming from Virginia, the term of the Congressman who gained his seat under procedures that have not been approved under § 5 has already expired. Consequently, only a grant of declaratory relief is appropriate in this case, as the appellants themselves recognize.

[12] Since the Voting Rights Act became effective in Mississippi in August 1965, the State will be able to escape the requirements of § 5 in 1970 by proving that it has not imposed a "test or device" in violation of § 4 for a five-year period. See text, at n. 3, *supra.* Section 5 will only continue to apply after 1970 if Mississippi is found to have continued imposing "tests or devices" after 1965. The Court's decision today, however, does not consider whether any of the statutes involved in these cases impose a "test" or "device" within the meaning of § 4, see n. 2, *supra.* It simply holds that the statutes fall into the much broader class of laws that modify a "standard, practice, or procedure with respect to voting" under § 5.

officials selected in violation of § 5 to hold office until their four-year terms expire in 1971.[13] An election for these offices may never be held in compliance with Congress' commands. And of course, the Court's decision respecting relief does not only control these particular cases. There may have been hundreds of officials throughout the South who began serving long terms in office this November under procedures that have not been federally approved. As a result of this part of the Court's decision, the Voting Rights Act may never play the full role that Congress intended for it.

It seems clear to me that we should issue a conditional injunction in the Mississippi cases along the lines suggested by the Solicitor General, except of course in the *Fairley* case which I think should be affirmed. Unless Mississippi promptly submits its laws to either the Attorney General or the District Court for the District of Columbia, new elections under the pre-existing law should be ordered. Of course, if the laws are promptly submitted for approval, a new election should be required only if the District Court determines that the statute in question is discriminatory either in its purpose or in its effect.

MR. JUSTICE MARSHALL, whom MR. JUSTICE DOUGLAS joins, concurring and dissenting.

I join Parts I through V of the Court's opinion. However, largely for the reasons stated in Part II of my

---

[13] The state senator, state representative, county supervisor, justice of the peace, and constable involved in *Whitley* v. *Williams,* No. 36, were all elected for four-year terms ending in 1971. See Mississippi Code § 3238 (1942). Similarly, the affected county superintendents of education in *Bunton* v. *Patterson,* No. 26, were appointed to four-year terms, expiring in 1971.

While I would affirm in *Fairley* v. *Patterson,* No. 25, the incumbents in that case also will serve until 1971.

Brother HARLAN's opinion, I believe the relief suggested by the Solicitor General should be ordered in the Mississippi cases. Accordingly, I dissent from Part VI of the Court's opinion.

MR. JUSTICE BLACK, dissenting.

Assuming the validity of the Voting Rights Act of 1965, as the Court does, I would agree with its careful interpretation of the Act, and would further agree with its holding as to jurisdiction and with its disposition of the four cases now before us. But I am still of the opinion that for reasons stated in my separate opinion in *South Carolina* v. *Katzenbach*, 383 U. S. 301, 355–362 (1966), a part of § 5 violates the United States Constitution. Section 5 provides that several Southern States cannot effectively amend either their constitutions or laws relating to voting without persuading the United States Attorney General or the United States District Court for the District of Columbia that the proposed changes in state laws do not have the purpose and will not have the effect of denying to citizens the right to vote on account of race or color. This is reminiscent of old Reconstruction days when soldiers controlled the South and when those States were compelled to make reports to military commanders of what they did. The Southern States were at that time deprived of their right to pass laws on the premise that they were not then a part of the Union and therefore could be treated with all the harshness meted out to conquered provinces. The constitutionality of that doctrine was certainly not clear at that time. And whether the doctrine was constitutional or not, I had thought that the whole Nation had long since repented of the application of this "conquered province" concept, even as to the time immediately following the bitter Civil War. I doubt that any of the 13 Colonies would have agreed to our Constitution

if they had dreamed that the time might come when they would have to go to a United States Attorney General or a District of Columbia court with hat in hand begging for permission to change their laws. Still less would any of these Colonies have been willing to agree to a Constitution that gave the Federal Government power to force one Colony to go through such an onerous procedure while all the other former Colonies, now supposedly its sister States, were allowed to retain their full sovereignty. While *Marbury* v. *Madison,* 1 Cranch 137 (1803), held that courts can pass on the constitutionality of state laws already enacted, it certainly did not decide to permit federal courts or federal executive officers to hold up the passage of state laws until federal courts or federal agencies in Washington could pass on them. Proposals to give judges a part in enacting or vetoing legislation before it passed were made and rejected in the Constitutional Convention; another proposal was made and rejected to permit the Chief Justice of this Court "from time to time [to] recommend such alterations of and additions to the laws of the U. S. as may in his opinion be necessary to the due administration of Justice, and such as may promote useful learning and inculcate sound morality throughout the Union . . . ." See my dissenting opinion in *Griswold* v. *Connecticut,* 381 U. S. 479, 515, n. 6 (1965).

It seems to me it would be wise for us to pause now and then and reflect on the fact that the separate Colonies were passing laws in their legislative bodies before they themselves created this Union, that history emphatically proves that in creating the Union the Colonies intended to retain their original independent power to pass laws, and that no justification can properly be found in the Constitution they created or in any amendment to it for degrading these States to the extent that

they cannot even initiate an amendment to their constitutions or their laws without first asking the permission of a federal court in the District of Columbia or a United States governmental agency. I would hold § 5 of the 1965 Voting Rights Act unconstitutional insofar as it commands certain selected States to leave their laws in any field unchanged until they get the consent of federal agencies to pass new ones.