Adam Clayton POWELL, Esther McCall, John W. Duncan, Robbie Clark, Martha P. Anderson and Joseph Steele, Plaintiffs suing for themselves and in behalf of all others similarly situated, Plaintiffs,

v.

James M. POWER, Thomas Mallee, Maurice J. O'Rourke, and J. J. Duberstein, constituting the Board of Elections of the City of New York,

and

Charles B. Rangel, Defendants.

No. 70 Civ. 4637.

United States District Court, S. D. New York.

Dec. 1, 1970.

619

Henry R. Williams, New York City, for plaintiffs.

Harold L. Fisher, Brooklyn, N. Y., for defendant Rangel.

MANSFIELD, District Judge.

On October 22, 1970, Adam Clayton Powell, together with five other voters who were registered as Democrats and reside in the 18th Congressional District, brought this suit seeking to void the Democratic primary conducted on June 23, 1970, for the election of a Democratic

nominee to be candidate for the office of United States Representative to Congress from that District. They also sought an order directing that a new primary be conducted and enjoining the Board of Elections from conducting on November 3, 1970, a general election for the office of Member of the House of Representatives.

In its original form the complaint invoked our jurisdiction pursuant to 42 U.S.C. § 1983 and 28 U.S.C. § 1343, claiming that as Democratic voters plaintiffs had been deprived of their federal constitutional rights by defendants' actions in permitting persons who were not registered Democrats to vote in the primary. It is undisputed that the primary resulted in nominating Charles B. Rangel by a plurality of 150 votes over Powell, the total vote being as follows:

| CANDIDATE | VOTES CAST |
| --- | --- |
| Charles B. Rangel | 8032 |
| Adam C. Powell | 7882 |
| John H. Young | 1584 |
| Ramon A. Martinez | 4510 |
| Jesse Gray | 2481 |
| | 24,489 |

The complaint alleged that the Board of Elections, by permitting some 1277 non-Democrats to vote in the primary, including 616 Republicans, 233 Liberals, 11 Conservatives, and 417 Independents, denied plaintiffs their right to a fundamentally fair election in which their valid votes would be counted free of any dilution or debasement by non-Democratic votes. It was also alleged that Powell was denied his constitutional right to be fairly considered for public office and that Rangel had not been fairly elected.

When plaintiffs' application for preliminary relief came on for hearing on October 23, 1970, the day after the action was commenced, we learned that Powell, in his capacity as a candidate, had in early July, 1970, applied to the New York County Supreme Court to set aside the primary under § 330(2) of the New York Election Law, McKinney's Consol.Laws, c. 17. On July 13, 1970, his application was dismissed because of his failure to institute the proceeding within the 10-day period prescribed by the statute. The dismissal was unanimously affirmed on appeal. On October 5, 1970, Judge McLean of this court denied a petition filed by Powell against the New York County Supreme Court and the Board of Elections, purportedly brought under 42 U.S.C. § 1983.

It further appeared at the October 23, 1970 hearing that plaintiffs did not have their proof in hand, that the voting records required by them for such proof had already been sent out in field kits to the various election districts within the 18th Congressional District for use in the general election to be held 10 days thereafter, and that if we were to subpoena these records, we would disrupt the general election, including the vote for many other offices, including Governor and United States Senator. Accordingly we denied a temporary restraining order and directed that hearings be held as soon as the voting records became available, which occurred approximately one week after the November 3 general election.

Pursuant to stipulation of the parties and our order, the pertinent voting records were canvassed by the parties hereto during the weeks of November 10 and 16, revealing that approximately 984 voters other than Democrats "signed in" at voting places in the Democratic primary held in the 18th Congressional District on June 23, 1970, as follows:

| | |
| --- | --- |
| Republicans | 617 |
| Conservatives | 13 |
| Liberals | 230 |
| Blank (i. e., no political party designation) | 124 |

In addition the party designation of 86 voters who signed in was unclear, and enrollment cards for another 162 were missing.

According to the public counters of the voting machines used in the primary in the 18th Congressional District, a grand total of 29,689 votes were cast (includ-

ing those who voted for Offices of Governor, Lt. Governor, Attorney General, and United States Senator) as compared with 24,489 votes cast for United States Representative.

 When we resumed hearings on November 23 and 24, 1970, plaintiffs offered evidence to the effect that when three voters went to cast their votes at the June 23d primary they found no voting levers opposite Powell's name, preventing them from voting for Powell, and that in a number of election districts the number of votes recorded by the public counters on the machines as having been cast in the primary substantially exceeded the number of voters recorded as having "signed in" at the voting places for such districts. When we pointed out that no claim of such irreguarities had been asserted in plaintiffs' complaint filed on October 22, 1970, plaintiffs filed an amended complaint on November 23, 1970, adding such claims. However, we disregard these latter claims for the reason that defendants were given no notice or opportunity to produce evidence with respect to them, and their stipulations with plaintiffs as to the canvassing of the voting records was limited to the irregularities charged in the original complaint.

## DISCUSSION

 Throughout these proceedings plaintiffs have frequently shifted ground as to the alleged basis of our jurisdiction and as to the factual showing which they believe that they must make in order to secure relief. Although the action began as one under the Federal Civil Rights statute, 42 U.S.C. § 1983, plaintiffs later asserted that their claim was also based on the Voting Rights Laws, 42 U.S.C. §§ 1971 and 1973, which were enacted to banish racial discrimination in voting and to implement Fifteenth Amendment guarantees. United States v. Mississippi, 380 U.S. 128, 85 S.Ct. 808, 13 L.Ed.2d 717 (1965); Allen v. State Board of Elections, 393 U.S. 544, 89 S.Ct. 817, 22 L.Ed.2d 1 (1969); South Carolina v.

Katzenbach, 383 U.S. 301, 86 S.Ct. 803, 15 L.Ed.2d 769 (1966). Section 1971 guarantees the right to all citizens to vote "without distinction of race, color, or previous condition of servitude," and § 1973 provides that no voting qualification, practice or procedure, shall be imposed or applied by any state in such a way as to deny a citizen the right to vote "on account of race or color." Plaintiffs concede that there is neither a claim nor any evidence of any racial discrimination in the primary election here under attack. However, they contend that notwithstanding the plain language of § 1973 it is not limited to cases of racial discrimination. We find this claim to be meritless.

 In simple terms plaintiffs' claim under § 1983 is that the substantial number of irregularities in the primary, without more, denies them Due Process and Equal Protection. No authority has been furnished which supports this proposition, and in our view a question of constitutional dimensions is not presented. The Constitution does not guarantee an "irregularity-free" election to voters in a state primary election. Snowden v. Hughes, 321 U.S. 1, 64 S.Ct. 397, 88 L.Ed. 497 (1944). If such were the law there would be few elections that would withstand such a challenge. Mistakes, clerical errors, and irregularities due to negligence, are almost inevitable in most elections. Here there is no claim of fraud. The evidence merely indicates that representatives of the Board of Elections failed to remove all non-Democratic cards (called "buff cards") from the locked "ring binders" that were sent out to the voting places in the 18th Congressional District for use in the primary, with the result that voters who were not Democrats were allowed to sign in and to obtain public counter cards entitling them to enter the voting booths and to vote. Such errors are not surprising, however, since there were some elction districts in New York City where Republican as well as Democratic primaries were simultaneously being conducted.

A closer question might have been presented if plaintiffs had come forth with evidence to the effect that without the irregular votes being cast the result of the primary would have been different. Plaintiffs, however, have failed to offer any evidence along these lines other than to point to the fact that prior to June 23, 1970, Rangel had been endorsed by the Republican Party as its candidate, from which we are asked to infer that of the 617 Republicans who "signed in" at the voting tables, 150 more voted for Rangel than for Powell. At first blush this seems plausible. However, defendants point out that Rangel has at all times been a registered Democrat, will go to Congress as such, that non-Democratic voters were influenced to participate in the primary by factors irrelevant to the Congressional primary, such as the existence of another primary contest in which black voters were particularly interested (the nomination of Patterson for Lt. Governor), and that many non-Democratic voters are unaware of their ineligibility to vote in a Democratic primary. We are also directed to the fact that in the Congressional primary there was a very substantial "fall-off"—5,200 votes—from the total number of votes cast in the primary for other offices; defendants urge that this reduces the probability that the invalid votes affected the outcome of the Congressional primary.

■ On this record, even assuming *arguendo* that our jurisdiction might be invoked under § 1983, we find that plaintiffs have failed to sustain their burden of showing that the irregularities were of such a nature as to establish the probability that the result of the election would have differed if the irregular votes had not been cast. A mere mathematical possibility is not enough. De Martini v. Power, 27 N.Y.2d 149, 314 N.Y.S.2d 609, 262 N.E.2d 857 (N.Y.Court of Appeals, Sept. 21, 1970); Badillo v. Santangelo, 15 A.D.2d 341, 224 N.Y.S.2d 356 (1st Dept. 1962); Straus v. Power,

22 N.Y.2d 886, 294 N.Y.S.2d 98, 241 N.E.2d 134 (1968).

■ Even if a jurisdictional basis existed we would further be constrained to deny the application because of plaintiffs' laches in instituting this suit. The primary election complained of was held on June 23, 1970. The basic facts relied upon by plaintiffs were brought to light in early July when Powell instituted his suit under the New York Election Law. Yet plaintiffs did not bring the present suit until October 22, 1970, on the eve of the general election. Having in mind the importance of finality in the election process, this delay was excessive and inexcusable. It is no answer that Powell's suit was pending. He was asserting a claim as a candidate under a different law, and not as a voter, and the weakness of his claim under the New York Election Law was publicly disclosed by the court's decision on July 12, 1970.

Lastly we should point out that, even assuming jurisdiction and a right to relief, after balancing the equities we do not believe, in the exercise of our discretion, that plaintiffs should be entitled to set aside the Democratic primary and the general election for the office of United States Representative for the 18th Congressional District. Traditional equitable considerations would bar such drastic relief. At most they would be entitled to an order containing provisions designed to prevent or minimize the recurrence in future elections of irregularities of the type complained of here. See Reynolds v. Sims, 377 U.S. 533, 586, 84 S.Ct. 1362, 12 L.Ed.2d 506 (1963); Roman v. Sincock, 377 U.S. 695, 711–712, 84 S.Ct. 1449, 12 L.Ed.2d 620 (1963); Davis v. Mann, 377 U.S. 678, 693, 84 S.Ct. 1441, 12 L.Ed.2d 609 (1963).

The motion for preliminary injunctive relief is denied.

The foregoing constitutes our findings of fact and conclusions of law pursuant to Rule 52(a), F.R.Civ.P.

It is so ordered.