Bobby WEBBER and Burel Jones, Individually, and on behalf of all other persons similarly situated

v.

Mark WHITE, Secretary of State of the State of Texas and Madrin Huffman, Clerk of Tarrant County, Texas.

Civ. A. No. CA 4–76–277.

United States District Court, N. D. Texas, Fort Worth Division.

Oct. 27, 1976.

7.  *City of Greenwood v. Peacock*, 384 U.S. 808, 831, 86 S.Ct. 1800, 1814, 16 L.Ed.2d 944 (1966).

**418**

Huey P. Mitchell, Fort Worth, Tex., for plaintiffs.

John L. Hill, Atty. Gen., David M. Kendall, Jr., First Asst. Atty. Gen., Austin, Tex., Tim C. Curry, Dist. Atty., Gerald Summerford, Asst. Dist. Atty., Tarrant County, Fort Worth, Tex., for defendants.

## MEMORANDUM AND ORDER OF DISMISSAL

MAHON, District Judge.

This action is brought under the Voting Rights Act of 1965, as amended, 42 U.S.C. §§ 1973–1973c [hereinafter "the Act"]. Plaintiffs filed their original complaint and application for a three-judge court on 21 September 1976, and the following day filed their motion for a temporary restraining order and preliminary injunction. A conference with counsel for all parties was held on Plaintiffs' motion for a temporary restraining order on 23 September 1976 in Dallas, Texas, during a recess in the trial of another case. Plaintiffs filed a brief in support of their motion for a temporary restraining order, injunctive relief, and convening of a three-judge court on 27 September 1976. After carefully considering Plaintiffs' pleadings, arguments, and brief, the Court, that same day, entered an Order denying Plaintiffs' motion for a temporary restraining order on the ground "that Plaintiffs [had] demonstrated no substantial likelihood of ultimate success on the merits of the case."

A letter brief on behalf of Defendant Mark White was received by the Court on 29 September 1976. In light of this letter brief and the Court's earlier consideration of Plaintiffs' motion for a temporary restraining order, the Court entered an Order on 29 September 1976 requiring all parties to "submit briefs (in quadruplicate, for the three-judge court) concerning possible dismissal for failure to state a claim or judgment on the pleadings, by 8 October 1976." [1]

In the meantime, Plaintiffs applied to the Court of Appeals for the Fifth Circuit for relief from this Court's denial of their motion for a temporary restraining order. Construing Plaintiffs' application for appellate review as either an appeal or an original motion in the nature of mandamus, the Court of Appeals upheld this Court's denial as "not amount[ing] to abusive discretion." *Webber v. White,* [No. 76–8375] (5th Cir. [30 September] 1976).

---

1. *See* Wright & Miller, *Federal Practice & Procedure* (1969) § 1357 at 593 & n. 43.

On 7 October 1976, this Court received a letter from Plaintiffs' counsel indicating that, with regard to the Order of this Court of 29 September 1976, Plaintiffs would stand on their earlier brief in support of their motion for a temporary restraining order. A brief on behalf of Defendant Mark White was filed on 8 October 1976.[2]

Accordingly, there is now before the Court the issue of Plaintiffs' possible failure to state a claim upon which relief can be granted, Fed.R.Civ.Proc. Rule 12(b)(6), raised by the Court in its Order of 29 September 1976, and subsequently raised by Defendant Mark White in his motion of 18 October 1976.

I

Accepting the facts as plead, it would appear that Plaintiff Bobby Webber and Leonard Briscoe were competing candidates in the Democratic Party primary election held on 5 June 1976. Both candidates sought the right to run as the nominee of the Democratic Party for the position of State Representative, District 32–H of Tarrant County, Texas, in the general election to be held on 2 November 1976. It appears that there will be no Republican Party opposition in the general election.

District 32–H of Tarrant County, Texas, is a predominantly Black state representative district.[3] Both candidates, Webber and Briscoe, are Black citizens of the United States of America and residents of State Representative District 32–H, Tarrant County, Texas.

The primary election was extremely close. Plaintiff Bobby Webber was initially declared the winner of the race by some 36 votes and that result was certified by the Tarrant County Democratic Party executive committee to the State Democratic Party, which in turn certified the results to Defendant Mark White, Secretary of State.

Leonard Briscoe subsequently filed a civil action under the Texas Election Code, art. 13.30, in the state district court of Tarrant County, Texas, contesting the election and alleging, among other matters, that some 113 absentee ballots should not be counted because they had been hand delivered and not mailed, in violation of Texas Election Code, art. 5.05(1)(c)(i).

Webber's usual business activities included operating one or more nursing homes in which there were many aged persons, along with others who were ill or infirm, but not yet of the age of 65 years. It was the votes of these, or of such of them who voted absentee, which were challenged by Briscoe's suit. Of these, there were 113 who voted for Webber and 1 who voted for Briscoe. There was no contention in Briscoe's suit that these were not qualified electors; there was no challenge of the way and manner in which they cast their absentee votes. The challenge related to the manner by which the electors obtained the absentee ballots by use of which they cast their votes. Briscoe contended that, as electors, they had never qualified themselves so as to lawfully obtain the privilege by which to vote absentee.

This matter was tried on the merits before the state district court, and on 1 July 1976, that court entered a memorandum opinion and decision in favor of Briscoe, against Webber, tossing out the 113 contested votes, and directing the placing of the name of Leonard Briscoe instead of that of Bobby Webber on the ballot for the 2 November 1976 general election for the position of State Representative, District 32–H. On 7 July 1976, the district court en-

---

**2.** Counsel for Defendant Madrin Huffman has indicated to the Court through a telephone conversation of 7 October 1976 that his client would simply adopt the position and arguments of Defendant Mark White.

**3.** This district is currently the subject of a redistricting suit in another federal district court. *Escalante v. White*, No. A–73–CA–115 (W.D. Tex.—San Antonio Div.). The election in question in this suit was run under a plan adopted by the Western District federal district court. The Western District Court, however, has retained jurisdiction over the redistricting action to entertain other plans for permanent redistricting after this year's elections.

Estimates of the Black population in District 32–H range from 60 to 85 percent.

tered Findings of Fact and Conclusions of Law, stating in part:

## "FINDINGS OF FACTS

### 1.

"Group applications . . . were filed with the County Clerk of Tarrant County, Texas, for the following named persons to vote absentee in the June 5, 1976 Democratic Party second or run-off election: [listing some 97 individuals].

### 2.

"Such applications were not mailed to the County Clerk, but were hand delivered to Estelle Teague, Deputy County Clerk, by one Martha Byers. Voter registration certificates for each of the applicants were hand delivered to Mrs. Teague by Mrs. Byers.

### 3.

"The original applications did not specifically state the grounds on which applicant was entitled to vote absentee, except that purported ages of each applicant appear after each name. Each applicant requested that an absentee ballot be mailed to him for the June 5th run-off. The address typed by the name of each applicant is not specifically shown to be either his permanent address or the address at which he is temporarily living; nor does the applicant state the address to which his voter registration certificate was to be mailed back to him.

### 4.

"M. Brooks, M.D., signed a group application for the following named persons, all under the age of sixty-five years, to vote absentee on the ground that they were not able to leave the nursing center to vote: [listing some 11 individuals].

### 5.

"The persons listed in Paragraph 4 did not sign the application, and no reason was given why they could not sign; nor was the application signed by a witness for such applicant; nor did the persons listed request an absentee ballot—The request was made by M. Brooks, M.D.

### 6.

"The Brooks application was not mailed to the County Clerk but was hand delivered to Estelle Teague, Deputy County Clerk, by Martha Byers, and the voter registration certificates of each were hand delivered to Mrs. Teague by Mrs. Byers.

### 7.

"The address shown by the name of each applicant in the Brooks application is not specifically shown to be either the permanent address of the applicant or the address at which he was temporarily living; nor did it state the address to which his voter registration certificate was to be mailed back to him.

### 8.

"The persons listed in Paragraph 4, being under the age of sixty-five years, could vote absentee by mail only if sick, physically disabled, confined in jail, or because of religious beliefs could not appear at the polling place of his residence on the day of the election. The statement "They are not able to leave the nursing center to vote" on the application signed by Brooks apparently is intended to be a certificate that each person listed was too sick or was physically disabled to appear at the polling place on the day of the election. Such statement was not a certificate, assuming M. Brooks, M.D., to be a duly licensed physician, that Brooks had personal knowledge of the physical condition of each person listed and that because of sickness or physical disability none of such persons would be able to appear at the polling place for the June 5, 1976, election; nor was such statement dated.

### 9.

"After the group applications . . . were delivered to Mrs. Teague she notified Mrs. Byers by mail . . . that the clerk would be "unable to process the requests because of Article 5.05 subdivision 2 and 2c of the Texas Election Code (Comparison of signatures, witnesses)". . . . Thereafter another group application . . . was made for absentee ballots for some of the persons listed on the original applications. . . . This second request for

ballots was not mailed to the County Clerk, but was hand delivered by Martha Byers to Mrs. Teague. . . . This second application does not state, nor did the original applications state, whether the respective nursing center was the permanent address or a temporary address of the individuals listed, and the second application did not specifically state the grounds on which applicant was entitled to vote absentee by mail except that purported ages of each applicant appears after each name; nor did the second application state the address to which the applicant's voter registration certificate was to be mailed back to him.

10.

"Ballots to vote absentee by mail were mailed by the County Clerk's Office to each of the persons listed in Paragraphs 1 and 4 above. The voter registration certificates were mailed back to Martha Byers as she had requested.

11.

"The persons listed in Paragraphs 1 and 4 above all voted in the June 5, 1976, Democratic Party second or run-off primary for a candidate for State Representative, District 32–H. All of the persons listed in Paragraphs 1 and 4 above voted for Bobby Webber except Lillie White (listed in Paragraph 1), who voted for Leonard Briscoe, for a total vote of 107 for Webber and one for Briscoe.

12.

"The tally lists . . . were in error in that the canvassed and certified vote of Bobby Webber of absentee votes by mail from the nursing centers was 103, when in fact Webber received 113 votes, which the Court determined by recounting the absentee ballots cast in this race after the election judge, Bogard, testified that he could not swear that there was an error in the tally lists without recounting the votes.

13.

"The 107 votes cast for Bobby Webber and the one vote cast for Leonard Briscoe by the persons listed in Paragraphs 1 and 4 above are void.

14.

"The total of the legal votes cast for Bobby Webber in the June 5, 1976, Democratic second primary or run-off election was 1459. The total of the legal votes cast for Leonard Briscoe in the same election was 1494.

15.

"Leonard Briscoe is the Democratic Party nominee for the office of State Representative, District 32–H, Tarrant County, Texas, in the 1976 General Election.

"CONCLUSIONS OF LAW

1.

"The legislature has made the manner of casting absentee ballots by mail mandatory, and the courts have held that if the statutory requirements are not complied with, the votes are void and shall not be counted. . . .

2.

"The applications to vote absentee by mail . . . were not mailed to the County Clerk's Office either by the persons named in Paragraphs 1 and 4 of the Findings of Fact or by someone at their request and on their behalf, and all of the identified votes cast by such persons are void and shall not be counted (Article 5.05 subdivision 1(c)(i) and subdivision 2(a), Texas Election Code).

3.

"Such applications to vote absentee by mail did not specifically state the applicant's permanent address and the address to which the absentee ballot was to be mailed to him, nor did it state the address to which his voter registration certificate was to be mailed back to him as required by Article 5.05 subdivision 1(d), Texas Election Code. Applicants themselves did not state that they were residents of the Eastwood Village Nursing and Retirement Center or the Webber Nursing Home or Center, although there was an attempt to supply this information by a notary public who made such a statement attached to one application. . . . Such applications . . . did not comply with Article 5.05 subdivision

1(d), Texas Election Code, and all of the certified votes (being 108 in number) cast by such persons are void and shall not be counted.

4.

"The application to vote, signed by M. Brooks, M.D., . . . does not comply with Article 5.05 subdivision 2(a) and (b), Texas Election Code, and all of the votes cast by persons listed in Paragraph 4 of the Findings of Fact are void and shall not be counted.

5.

"The mere fact that group applications were filed does not make the votes void.

6.

"The actions of personnel of the County Clerk's Office in processing the applications did not deprive the persons listed thereon of rights granted to them under the equal protection clause and due process clause of the 14th Amendment, United States Constitution."

Between 1 July 1976 and 25 August 1976, the Justices of the Texas Court of Civil Appeals for the Second Supreme Judicial District, interrupted their vacations to sit, hear, and deny a special motion by Webber.[4] Webber then sought a writ of mandamus in the Texas Supreme Court to compel the Court of Civil Appeals to act in accord with his motion. The appropriate number Justices of the Texas Supreme Court interrupted their vacations to return and act on Webber's request. On 25 August 1976, the Supreme Court of Texas denied the relief sought.

The Texas Court of Civil Appeals for the Second Supreme Judicial District heard the case by an accelerated appeal on 3 September 1976. On 10 September 1976, the Court of Civil Appeals affirmed the district court's judgment in a scholarly *per curiam* opinion. Claiming that the Texas Supreme Court had no jurisdiction over this sort of controversy, Webber applied directly to Jus-

tice Powell of the United States Supreme Court for an emergency stay. Justice Powell denied Webber's application. Webber then reapplied for an emergency stay to Justice Marshall, who also denied relief. Webber then filed this lawsuit in federal district court.

*See Briscoe v. Webber,* No. 17–38503–76 (Tex.Dist.Ct.—17th Jud'l Dist., Tarrant County 1 & 7 July 1976), *aff'd* [No. 17816] (Tex.Civ.App.—Ft. Worth [10 September] 1976).

## II

Plaintiffs contend that the method by which the applications for ballots were made and processed was regular and done in a manner which had been done in other elections in past years. Plaintiffs claim that the practice of hand-delivering applications for absentee ballots was an established procedure in Tarrant County, Texas, and that the judgment of the state court altered that practice. Plaintiffs maintain, therefore, that they have stated causes of action under 42 U.S.C. §§ 1973–1973c.

Plaintiff pleads that the testimony at the state district court trial by both Defendant Madrin Huffman, County Clerk for Tarrant County, Texas, and Estelle Teague, the Deputy Clerk in charge of absentee voting, support Plaintiffs' contention that the Tarrant County Clerk's Office had previously accepted hand-delivered applications for absentee ballots. It is undisputed, however, that such practice was at all times contrary to the Texas Election Code, art. 5.05(1)(c)(i), and that no suit contesting the practice had previously been brought before a state court in Tarrant County, Texas.

Plaintiffs attached as exhibits B and C to their pleadings the state court decisions previously discussed. Plaintiff refers to these decisions in his pleadings, and the Court will rely on them for purposes of this motion.[5] There is no dispute between the parties as to the facts involved or the appli-

---

**4.** This motion was apparently in the nature of either an emergency appeal or an application for a writ of mandamus against the state district judge.

**5.** *See* Wright & Miller, *supra* note 1, § 1357 at 593 & n. 41.

cation of the law of the State of Texas. The only question before this Court is whether Plaintiffs have stated causes of action under 42 U.S.C. §§ 1973–1973c.

Plaintiffs have prayed for injunctive relief prohibiting Defendants Mark White and Madrin Huffman from enforcing or carrying out the orders of the state court and directing Defendants not to interfere with the certificate showing the name of Bobby Webber as the Democratic Party nominee for State Senator from District 32–H in the 2 November 1976 general election.

### III

■ To begin, Plaintiffs' assertion of a violation of civil rights under 42 U.S.C. § 1973a must be dismissed for failure to understand the nature of the statute. 42 U.S.C. § 1973a does not give rise to a substantive cause of action but simply sets forth the procedure and remedies available in a proceeding to enforce the guarantees of the Fifteenth Amendment. It provides for court authorization for appointment of federal examiners, injunctive suspension of tests and devices, and retention of jurisdiction. It does not, however, provide a basis on which to state a cause of action.

### IV

■ 42 U.S.C. § 1973b prohibits only the use of tests or devices in determining eligibility to vote. "Tests or devices" are defined by subsection (c) of 42 U.S.C. § 1973b as follows:

> The phrase "test or device" shall mean any requirement that a person as a prerequisite for voting or registration for voting (1) demonstrate the ability to read, write, understand, or interpret any matter, (2) demonstrate any educational achievement or his knowledge of any particular subject, (3) possess good moral character, or (4) prove his qualifications by the voucher of registered voters or members of any other·class.

The change in procedure complained about in this case, the requirement of the Texas Election Code, art. 5.05(1)(c)(i), that

an application for an absentee ballot be mailed, not hand-delivered, to the county clerk, is plainly not a "test or device" as that phrase is used in 42 U.S.C. § 1973b, and Plaintiffs have therefore failed to state a cause of action under 42 U.S.C. § 1973b.

### V

Section 5 of the Voting Rights Act of 1965, as amended, 42 U.S.C. § 1973c, provides that "[a]n action [under] this subsection shall be heard and determined by a court of three judges in accordance with the provisions of section 2284 of Title 28 and any appeal shall lie to the Supreme Court." It is a threshold question of law, therefore, whether a single judge can dismiss Plaintiffs' cause of action under 42 U.S.C. § 1973c for failure to state a claim.

28 U.S.C. § 2284, which sets forth the procedure and composition of three-judge district courts, has recently been amended by Act of 12 August 1976, Pub.L. 94–381, which also repealed 28 U.S.C. §§ 2281 & 2282. The powers of a single judge within the context of a case where a three-judge court is proper were set forth in subsection (5) of 28 U.S.C. § 2284 prior to the 12 August 1976 amendment [hereinafter "old § 2284(5)"], and are now set forth in subsection (b)(3) of the amended statute [hereinafter "new § 2284(b)(3)"].

It was clear under old § 2284(5) that a single judge did not have the power to dismiss a civil action under Fed.R.Civ.Proc. Rule 12(b)(6). In pertinent part, old § 2284(5) provided:

> Any one of the three judges of the court may perform all functions, conduct all proceedings except the trial, and enter all orders required or permitted by the rules of civil procedure. A single judge shall not appoint a master or order a reference, . . . *or dismiss the action,* or enter a summary or final judgment. The action of a single judge shall be reviewable by the full court at any time before final hearing.

(emphasis added).

The emphasized phrase concerning dismissal is conspicuously absent from new

§ 2284(b)(3), which provides in relevant part:

> A single judge may conduct all proceedings except the trial, and enter all orders permitted by the rules of civil procedure except as provided in this subsection. . . . A single judge shall not appoint a master, or order a reference, or hear and determine any application for a preliminary or permanent injunction or motion to vacate such an injunction, or enter judgment on the merits. Any action of a single judge may be reviewed by the full court at any time before final judgment.

The legislative history of Pub.L. 94–381 indicates a congressional purpose to expand the powers of the single judge in the context of a three-judge court case. H.R.Rep. No. 94–1379 simply adopts the language of S.Rep. No. 94–204, U.S.Code Cong. & Admin.News 1976, p. 1988, which unfortunately fails to distinguish between subsections (b)(2) and (b)(3) of new § 2284, but which, in what must be interpreted as a reference to new § 2284(b)(3), states:

> This clause is obviously desirable "to allocate as many functions as possible to a single district judge, consistent with the statutory purpose." Note, 77 [Harv.L. Rev.] 299, 306 (1963); Currie [,] The Three-Judge District Court in Constitutional Litigation [,] 32 [U.Chi.L.Rev.] 1, 20–29 (1964): 28 U.S.C. § 2284(3). The other powers here given the single judge, or expressly denied him, are similar to those stated in § 2284(5).

H.R.Rep. No. 94–1379 at 7; S.Rep. No. 94–204 at 13, U.S.Code Cong. & Admin.News 1976, p. 2001.

The Senate Report contains a fairly detailed analysis of the history and purpose of the three-judge court acts. It notes that the purpose for requiring three judges in cases where the federal injunctive power might be used to enjoin state statutes and regulatory programs was for the states' benefit. "The rationale of the act was that three judges would be less likely than one to exercise the Federal injunctive power imprudently. It was felt that the act would relieve the fears of the States that they would have important regulatory programs precipitously enjoined." S.Rep. No. 94–204 at 2, U.S.Code Cong. & Admin.News 1976, p. 1989.

There is logic in the view that the grant, not the refusal, of an injunction by a single judge is the abuse to be guarded against by the statute. C. Wright, *Handbook of the Law of Federal Courts* § 50 at 191 (1970) [hereinafter "Wright, *Federal Courts*"]. Nevertheless, it was held very early that a single judge could not dismiss an action proper for a three-judge court on the merits, *Ex parte Metropolitan Water Co. of W. Va.,* 220 U.S. 539, 31 S.Ct. 600, 55 L.Ed. 575 (1911), and this determination is clearly carried forward in the present language of new § 2284(b)(3).

A dismissal for failure to state a claim under Fed.R.Civ.Proc. Rule 12(b)(6), however, is not a "judgment on the merits," Wright & Miller, *Federal Practice & Procedure* § 1357 at 611–612, but it clearly is an order "permitted by the rules of civil procedure." The question of the power of a single judge to enter a Rule 12(b)(6) order of dismissal is not the same as that of entering final judgment on the merits.

The emphasized phrase concerning dismissals in old § 2284(5) was added to the statute by Act of 6 April 1942, 56 Stat. 199. Congress evidently intended by adding the phrase to overrule the now essentially moot *Poresky*[6] doctrine. Wright, *Federal Courts* § 50 at 191–192 & authorities cited in n. 32. The *Poresky* doctrine allowed a single judge, in a case brought under 28 U.S.C. § 2281, to determine whether there was a substantial federal question involved in the plaintiff's claim of unconstitutionality of a state statute, and to either dismiss or summarily grant relief if the case for either side was patently frivolous or foreclosed by prior decisions of the Supreme Court. The

---

6. *Ex Parte Poresky,* 290 U.S. 30, 54 S.Ct. 3, 78 L.Ed. 152 (1934); *Bailey v. Patterson,* 369 U.S. 31, 82 S.Ct. 549, 7 L.Ed.2d 512 (1962).

federal courts continued to apply the *Poresky* doctrine despite the 6 April 1942 amendment to old § 2284(5), on the ground that the doctrine involved a question of jurisdiction under 28 U.S.C. § 2281, not one of procedure under old § 2284(5).

With the repeal of 28 U.S.C. § 2281, the *Poresky* doctrine has become essentially moot. The deletion of the phrase "[a] single judge shall not . . . dismiss the action" clearly represents the understanding by the drafters of the new statute that the *Poresky* doctrine is moot and invites the single judge to exercise his power to dismiss under the Federal Rules of Civil Procedure. When coupled with a legislative history favoring allocation of as many functions as possible to a single judge and a legislative purpose only of protecting the states from the imprudent exercise of federal injunctive power, the conspicuous absence of any prohibition against dismissals inescapably leads to the conclusion that, under new § 2284(b)(3), Congress intended a single judge to have the power to dismiss under Fed.R.Civ.Proc. Rule 12.

The Court is therefore of the opinion that a single judge has the power under new § 2284(b)(3) to dismiss Plaintiffs' cause of action under 42 U.S.C. § 1973c for failure to state a claim upon which relief can be granted.

## VI

In relevant part, 42 U.S.C. § 1973c provides:

Whenever a State or political subdivision with respect to which the prohibitions set forth in section 1973b(a) of this title . . . are in effect shall enact or seek to administer any voting qualification or prerequisite to voting, or standard, practice, or procedure with respect to voting different from that in force or effect on November 1, 1964, or whenever a State or political subdivision with respect to which the prohibitions set forth in section 1973b(a) of this title . . . are in effect shall enact or seek to administer any voting qualification or prerequisite to voting, or standard, practice, or

procedure with respect to voting different from that in force or effect on November 1, 1972, such State or subdivision may institute an action in the United States District Court for the District of Columbia for a declaratory judgment that such qualification, prerequisite, standard, practice, or procedure does not have the purpose and will not have the effect of denying or abridging the right to vote on account of race or color, or in contravention of the guarantees set forth in section 1973b(f)(2) of this title, and unless and until the court enters such judgment no person shall be denied the right to vote for failure to comply with such qualification, prerequisite, standard, practice, or procedure: *Provided,* That such qualification, prerequisite, standard, practice, or procedure may be enforced without such proceeding if the qualification, prerequisite, standard, practice or procedure has been submitted by the chief legal officer or other appropriate official of such State or subdivision to the Attorney General and the Attorney General has not interposed an objection within sixty days after such submission, or upon good cause shown, to facilitate an expedited approval within sixty days after such submission, the Attorney General has affirmatively indicated that such objection will not be made. Neither an affirmative indication by the Attorney General that no objection will be made, nor the Attorney General's failure to object, nor a declaratory judgment entered under this section shall bar a subsequent action to enjoin enforcement of such qualification, prerequisite, standard, practice, or procedure. . . .

The Supreme Court has interpreted this section, § 5 of the Act, to allow suits by private parties seeking declaratory judgments that a new state enactment is governed by this section. If the declaratory judgment issue is resolved in favor of the individual plaintiff, and the plaintiff can prove that the state has failed to submit the covered enactment for approval, then "the private party has standing to obtain an

injunction against further enforcement, pending the State's submission of the legislation pursuant to § 5." *Allen v. State Bd. of Elections,* 393 U.S. 544, 554–557, 89 S.Ct. 817, 826, 22 L.Ed.2d 1 (1969). The Supreme Court further extrapolated from the language of 42 U.S.C. § 1973c that all such suits by private individuals were to be heard by three-judge courts in the districts in which the plaintiffs reside. *Id.,* 393 U.S. at 557–563, 89 S.Ct. 817.

Thus, the most relief that a federal district court can grant to a private litigant under the *Allen* interpretation of 42 U.S.C. § 1973c is a judicial declaration that the state enactment in question falls under the requirements of the section and an injunction against enforcement of the state enactment until the state has properly submitted it under the Act.

In the present case, however, the Texas Election Code, art. 5.05(1)(c)(i), has already been submitted pursuant to 42 U.S.C. § 1973c. Article 5.05(1)(c)(i) was part of the Texas Election Code prior to 1 November 1972, but was amended by the Texas legislature in 1975. Texas Laws 1975, ch. 682, § 5, at 2082–2084. The amended statute was submitted to the Justice Department as required by 42 U.S.C. § 1973c, and the Attorney General of the United States notified the Texas Secretary of State on 9 January 1976 that no objection was being interposed.

Thus, there is no relief under 42 U.S.C. § 1973c available to Plaintiffs, with regard to the already submitted statute.

Once the State has successfully complied with the § 5 approval requirements, private parties may enjoin the enforcement of a new enactment only in traditional suits attacking constitutionality; there is no further remedy provided by § 5.

*Allen v. State Bd. of Elections, supra,* 393 U.S. at 549–550, 89 S.Ct. at 823.

The state court in *Briscoe v. Webber, supra,* simply enforced the already submitted state statute. The state court decision involved no embellishment or creation of new procedure over and above the dic-

tates of the statute. The language of Texas Election Code, art. 5.05(1)(c)(i), is mandatory:

The application for an absentee ballot shall be made not more than sixty days before the day of the election. It *must be mailed* to the clerk and the clerk shall preserve the envelope in which it is received. If the application is delivered to the clerk *by any other method other than by mailing* it to him, the ballot *shall be void* and *shall not be counted.*

(emphasis added). The mandatory nature of this statute is well-established in Texas case law. *Atkinson v. Thomas,* 407 S.W.2d 234, 246–247 (Tex.Civ.App., Austin 1966, no writ); *Farrell v. Jordan,* 338 S.W.2d 269, 277–279 (Tex.Civ.App., Houston 1960, writ dism'd).

Even if the state courts had had to interpret or construe the statute in question, under 42 U.S.C. § 1973c, this Court would have no power to review such state judicial decisions.

It is well-settled that 42 U.S.C. § 1973c does not apply to federal court decisions *per se* entered under the equity power of the court. In a recent case involving reapportionment, the Supreme Court stated:

In any event, we agree with the Court of Appeals, *Zimmer v. McKeithen,* 467 F.2d 1381, 1383 (CA 5 1972); *Zimmer v. McKeithen,* 485 F.2d 1297, 1302 n. 9 (CA 5 1973) (en banc), that court-ordered plans resulting from equitable jurisdiction over adversary proceedings are not controlled by § 5. Had the East Carroll police jury reapportioned itself on its own authority, clearance under § 5 of the Voting Rights Act would clearly have been required. *Connor v. Waller,* 421 U.S. 656, 95 S.Ct. 2003, 44 L.Ed.2d 486 (1975). However, in submitting the plan to the District Court, the jury did not purport to reapportion itself in accordance with the 1968 enabling legislation. . . . Since the reapportionment scheme was submitted and adopted pursuant to court order, the preclearance procedures of § 5 do not apply.

*Connor v. Johnson,* 402 U.S. 690, 691, 91 S.Ct. 1760, 29 L.Ed.2d 268 (1971).

*East Carroll Parish School Bd. v. Marshall,* 424 U.S. 636, 638 n. 6, 96 S.Ct. 1083, 1085, 47 L.Ed.2d 296, 299 n. 6 (1976). In its first opinion in *Zimmer v. McKeithen, supra,* 467 F.2d at 1383, the Fifth Circuit Court of Appeals stated:

It must be noted that this is not a case in which a legislature, board, or commission attempted to reapportion itself. In such a case, Section 5 clearly applies. What we have here is an adversary action, invoking the equity jurisdiction and the equitable adjudication of the District Court. . . . *[C]ourt ordered plans resulting from equitable jurisdiction over adversary proceedings are not controlled by Section 5.* If this were not so, the exercise of jurisdiction by the courts would be meaningless. The Attorney General has no authority to review or to set aside the judgments of courts duly entered in the exercise of their jurisdiction over the parties and the subject matter.

*Allen v. State Board of Elections,* 393 U.S. 544, 89 S.Ct. 817, 22 L.Ed.2d 1 (1969) was concerned with legislative enactments, not judicial determinations.

(emphasis added).

There is no reason why, under 42 U.S.C. § 1973c, state judicial constructions or embellishments on state enactments should be treated any differently from federal court equity determinations.[7]

The Act, itself, in 42 U.S.C. § 1973c, uses the terms "shall enact" and "seek to administer." The limitation of the applicability of this section to legislative, executive, and administrative actions is self-evident from the use of these terms. The legislative history of § 5 of the Voting Rights Act of 1965 indicates that Congress feared the ingenuity of those in legislative and executive positions who were bent on preventing Blacks from voting. *See* H.R.Rep. No. 89–439 at 10–11; S.Rep. No. 89–162, pt. 3 at 8 & 12, U.S.Code Cong. & Admin.News 1965, p. 2437. There is no indication in the legislative history that Congress sought the Attorney General's review of state judicial law-making. The Attorney General, himself, appears to have assumed that only legislation and administrative actions are subject to his review. *See* 28 C.F.R. §§ 51.-2(b), 51.4(c), 51.6, 51.7, 51.10(a)(1), 51.-10(b)(3), (4), & (7), & 51.11 (1975).

This Court is aware that the Supreme Court has held that Congress intended that the Act be given "the broadest possible scope" to reach "any state *enactment* which altered the election law of a covered State in even a minor way." *Allen v. State Bd. of Elections, supra,* 393 U.S. at 566–567, 89 S.Ct. at 832 (emphasis added). But there is nothing in the Supreme Court's detailed analyses of the history, purposes, and application of 42 U.S.C. § 1973c that would lead this Court to believe that state judicial constructions of state statutes are covered by this section of the Act. *See Georgia v. United States,* 411 U.S. 526, 529–535, 93 S.Ct. 1702, 36 L.Ed.2d 472 (1973); *Perkins v. Matthews,* 400 U.S. 379, 387–395, 91 S.Ct. 431, 27 L.Ed.2d 476 (1971); *Allen v. State Bd. of Elections, supra,* 393 U.S. at 554–571, 89 S.Ct. 817.

There are several reasons why state judicial law-making (construction, interpretation, embellishment, etc., of statutes and administrative orders), as opposed to judicial enforcement of unsubmitted enactments, should not be covered by this section of the Act. If they were subject to the Act, there would be a possibility of innumerable submissions required for each state statute or administrative action involving voting. Legislative and administrative actions are taken but once and taken directly by the state. The state can therefore be expected to be in a position to explain and defend the reasons for its action. Most litigation over voting procedure in state courts involves actions by and against private litigants. The state executive and legislative branches

---

7. *But see Citizens Committee to Oppose Annexation v. City of Lynchburg, Va.,* 400 F.Supp. 68, 71–73 (W.D.Va.1975).

have no control over the frequency of such suits, the questions raised therein, and the decisions reached. It would be unrealistic to expect the state executive branch to explain and defend a decision by the state's judicial branch, a decision with which the other branches may even disagree.

If 42 U.S.C. § 1973c were to cover judicial constructions of statutes, its effect would be to require the state to submit state court decisions in suits between private litigants to the United States District Court for the District of Columbia for approval.[8] Even assuming *arguendo* that Congress has the constitutional power to require such a convoluted appeal, this Court cannot believe that Congress intended to require the state executive to collaterally support all state court rulings in cases between private litigants in a foreign federal district court.

Finally, the private litigants have adequate remedies other than 42 U.S.C. § 1973c by which to protect their civil rights.[9] Constitutional questions concerning racial discrimination in voting procedure raised in the original state court litigation can be appealed directly to the Supreme Court, as has been done in this case. If that avenue of review is for some reason not available, or not sufficiently practical to manifest a realistic review, the private litigants can collaterally attack a state court decision on voting procedure through § 2 of the Act, 42 U.S.C. § 1973.

### VII

■ Section 2 of the Voting Rights Act of 1965, as amended, 42 U.S.C. § 1973, provides in pertinent part:

No voting qualification or prerequisite to voting, or standard, practice, or procedure shall be imposed or applied by any State or political subdivision to deny or abridge the right of any citizen of the United States to vote on account of race or color. . . .

Unlike 42 U.S.C. § 1973c, 42 U.S.C. § 1973 does not provide for a special three-judge court, so any cause of action based on this section is to be heard by a regular federal district court of one judge. *See, e. g., Toney v. White,* 348 F.Supp. 188, 189 (W.D.La. 1972), *aff'd in part & rev'd in part,* 476 F.2d 203 (5th Cir. 1973), *modified & aff'd,* 488 F.2d 310 (5th Cir. 1973) (en banc); *Powell v. Power,* 320 F.Supp. 618, 621 (S.D.N.Y.1970), *aff'd,* 436 F.2d 84 (2d Cir. 1970).

■ Although there are no reported cases that have been brought under 42 U.S.C. § 1973, wherein the plaintiffs have attacked state court decisions rather than state legislative or administrative enactments, the section would appear to allow such actions to be brought. This section uses the terminology "imposed or applied" rather than the "enact or . . . administer" language of 42 U.S.C. § 1973c. The language of 42 U.S.C. § 1973 is certainly broad enough to encompass state judicial law-making.

■ Nor is Plaintiff's suit barred by the fact that the state court in the present case only applied a previously submitted, mandatory statute. The Act, in 42 U.S.C. § 1973c, provides that neither submission to the Attorney General nor a declaratory judgment by the United States District Court for the District of Columbia "shall bar a subsequent action to enjoin enforcement of such qualification, prerequisite, standard, practice, or procedure."

In any suit of this nature based on state judicial action, there is inevitably a question of whether the issues involved herein were substantially raised in the state court proceeding so as to collaterally estop, or act as *res judicata* on, the second lawsuit. It

---

**8.** *See Allen v. State Board of Elections, supra,* 393 U.S. at 549, 89 S.Ct. at 823:

The Attorney General does not act as a court in approving or disapproving the state legislation. If the Attorney General objects to the new enactment, the State may still enforce the legislation upon securing a declaratory judgment in the District Court for the Dis-

trict of Columbia. Also, the State is not required to first submit the new enactment to the Attorney General as it may go directly to the District Court for the District of Columbia.

**9.** *See Zimmer v. McKeithen,* 485 F.2d 1297, 1302 n. 9 (5th Cir. 1973).

would appear that Webber did raise some sort of constitutional equal protection claim which was substantively denied in both the state district and appellate courts, and which is now on appeal to the United States Supreme Court. *Briscoe v. Webber, supra,* No. 17–38504–76 at 8; [No. 17816 at 8–10]. Webber's equal protection claim in state court appears to have been so far-fetched, however, that neither state court managed to determine on what specific grounds Webber based his claim. This Court will give Plaintiffs the advantage of the doubt and, *arguendo,* assume that the question of racial discrimination has not been previously decided in the state courts.

▪ That the voting practice in question has been "imposed or applied . . . on account of race or color" is a necessary element of 42 U.S.C. § 1973. *Powell v. Power, supra,* 320 F.Supp. at 621. This Court now finds that Plaintiffs have failed to plead this necessary element, and holds that Plaintiffs have therefore failed to state a claim under 42 U.S.C. § 1973.

▪ Plaintiffs' pleadings merely state that their rights under 42 U.S.C. § 1973 have been denied, and then track the language of the statute. Pleadings that do nothing more than track the statutes on which they attempt to base a claim are not well plead. Such language constitutes unsupported legal conclusions cast in the form of factual allegations, Wright & Miller, *supra,* § 1357 at 594–596 & n. 48–57, and pleadings that rely on such language fail to state a cause of action.

By virtue of the state court decisions attached to the complaint, this Court has been presented with an unusually massive amount of detailed factual pleading. Taking all factual allegations and representations as true, they do not bear out the conclusory legal allegations of Plaintiffs; indeed, they readily and inescapably contradict those legal allegations. *See* Wright & Miller, *supra,* § 1357 at 596–598.

▪ The mere recitation of the fact that one Plaintiff is a member of the Black race does not, in any ordinary case, suffice to raise the issue of racial prejudice. In the present case, such pleading is entirely irrelevant to the issue of racial prejudice since both candidates for the desired position were Black, and the district in which they were running was predominantly Black.

▪ Plaintiffs' statement that "part" of the alleged class of voters whose absentee ballots were invalidated is composed of Black citizens is similarly insufficient, and actually contradicts the conclusory legal allegation of racial prejudice.

Here the state court merely followed a mandatory statute. There is not, and the Court is of the opinion that there cannot possibly be, any allegation that the purpose or effect of the Texas Election Code, art. 5.05(1)(c)(i), in requiring that applications for absentee ballots be mailed instead of hand delivered, is to deny or abridge the right to vote on account of race or color.

### VIII

▪ As a final reason for dismissing this cause of action under Fed.R.Civ.Proc. Rule 12(b)(6), the Court notes that even if Plaintiffs could succeed on their claims under 42 U.S.C. §§ 1973 & 1973c, under the facts as plead, this Court could not grant the relief requested.

Plaintiffs have sought injunctive relief prohibiting Defendants from enforcing or carrying out the order of the state courts and directing Defendants not to interfere with the certificate showing the name of Bobby Webber as the Democratic Party nominee for State Representative from District 32–H in the 2 November 1976 election.

The state court found that, under the Texas Election Code, art. 5.05(1)(c)(i), 113 absentee ballots in favor of Webber were invalid because of the improper delivery of applications. It is this holding and this statute that Plaintiffs have attacked in the present lawsuit.

But the state district court additionally held that 108 of those 113 ballots were also invalid for failure to specifically state in the application the applicant's permanent ad-

dress and the address to which the absentee ballot was to be mailed back to him, as required by the Texas Election Code, art. 5.05(1)(d). *Briscoe v. Webber, supra,* No. 17–38503–76 at 7. Of these 108 votes, 107 were for Webber. Hence, the greatest relief that could conceivably be granted by this Court would be to enjoin the State of Texas from invalidating some six ballots (the difference between 113 and 107). These six votes would change the state district court's tally of total legal votes cast for Bobby Webber to 1465, which would still be under Leonard Briscoe's total of 1494 votes. The state court directive to place Leonard Briscoe's name on the ballot for the 2 November 1976 general election must, therefore, remain in force.

### IX

Accordingly, the Court ORDERS that the above-referenced cause of action be hereby, in all respects, dismissed for failure to state a claim upon which relief can be granted. Fed.R.Civ.Proc. Rule 12(b)(6).